(35 South. 976.)

No. 14,908.

HALL et al. v. BOARD OF COM'RS OF BOSSIER LEVEE DIST.*

(Feb. 1, 1904.)

PUBLIC LANDS—GRANT OF SWAMP LANDS—SALE BY STATE — PETITORY ACTION — DEFENSES—ESTOPPEL—STREAMS—PRE-EMPTION RIGHTS.

1. Where a subdivision of land was granted to the state of Louisiana under the acts of Congress of 1849 (Act March 2, 1849, c. 87, 9 Stat. 352) and 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519), there can be no reason to doubt that the grant carried with it all the land in the subdivision, whether dry or overflowed, since those acts provide that "all subdivisions" shall be granted, "the greater part of which is" swamp land, subject to overflow, and that, "when the greater part of a subdivision is not of that character, the whole of it shall be excluded from the grant."

2. Under the swamp-land grant acts of Congress of 1849 (Act March 2, 1849, c. 87, 9 Stat. 352) and 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519) the lands granted to the state were "subject to be disposed of by the Legislature," and under the act of the General Assembly No. 247, p. 306, of 1855, shallow lakes so acquired, not navigable, could be sold only after their area had been ascertained by surveys recognized by the state.

3. Where a defendant in a petitory action sets up as a muniment of title a government

*Rehearing denied February 29, 1904.

survey, from the plat of which it appears that a certain lake or stream was meandered at the water's edge, he is in no position to show that such was not the case.

4. The defenses to a petitory action that the land was acquired by accession as alluvion, or as relicted land, and that it was acquired as dry land within the boundaries of the original purchase, are conflicting, and cannot stand together.

5. Red Shoot Lake (otherwise called Flat River), between the upper and lower ends, has been a mere slough in the midst of a body of land subject to overflow, and serving to carry the waters of the lake, sometimes in one direction and sometimes in another. Being part of a shallow lake, the land under which is susceptible of reclamation, it is not to be regarded as a "stream" within the meaning of the law regulating titles to estates bordering on streams.

6. No pre-emption rights could be acquired, under Act No. 21, p. 31, of 1886, on land in the Bossier Levee District, after the passage of Act No. 89, p. 113, of 1892, donating those lands to that district.

(Syllabus by the Court.)

Appeal from Second Judicial District Court, Parish of Bossier; John Thomas Watkins, Judge.

Action by Nannie Hall and others against the Board of Commissioners of Bossier Levee District. Judgment for defendant, and plaintiffs appeal. Amended and affirmed.

William Pike Hall, for appellants. Andrew Jackson Murff and Thomas Fletcher Bell, for appellee.

MONROE, J. Plaintiff filed a petition in the district court, alleging that she is the owner of a certain tract of land in the parish of Bossier, which may be described as lot No. 1, extending from west to east across sections 8, 9, and 10, of T. 16 N., R. 12 W., measuring 10 chains in width (from north to south), between parallel lines, and separated from the upper lines of the sections mentioned by lot No. 2, of like dimensions; that defendant has illegally set up a claim to certain alluvion along the banks of Flat river, sometimes called Red Chute, which forms part of said tract, and has advertised a certain portion thereof described as lots 6, 7, and 8 of section 9 and 6, 7, 8, and 9 of section 10, and will sell the same unless restrained. She therefore prays that the defendant be enjoined from proceeding with the proposed sale, and ordered to

desist from slandering her title, or else to bring suit upon its own title, and that she have judgment for damages. The preliminary injunction having issued as prayed for, the defendant answered, alleging that the lots mentioned are within the traverse and meander lines of Red Chute Lake, as per the map and survey approved by the Surveyor General December 14, 1839, and on file in the office of the recorder of the parish of Bossier; that it became the owner of the same by grant from the state of Louisiana, under Act No. 89, p. 113, of 1892, and conveyance from the auditor and the register of the state land office, duly recorded, and that the state acquired its title from the United States under the swamp land acts of 1849 (Act March 2, 1849, c. 87, 9 Stat. 352) and 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519). It further alleges that at the date of the grant last mentioned, and for many years afterwards, the lands in question were low and wet, were "swamp and overflowed lands" within the meaning of said acts of 1849 and 1850, and that they have been reclaimed by means of dykes and levees built by the state and by defendant, in accordance with the purpose of the grant by which they were acquired. Defendant therefore prays that the preliminary injunction be dissolved, with attorney's fees, and that it be recognized as the owner of said lands, and put in possession thereof.

To this the plaintiff filed a pleading in the nature of a replication, in which she sets forth the title under which she claims, with the grounds relied for its support, and prays that the same be recognized, or, in the alternative, that she be allowed to purchase the land in dispute according to the provisions of Act No. 21, p. 31 of 1886; and she further prays, if defendant be allowed to recover that said land be so located as to embrace "the channel of said meandered stream" (referring to Red Chute Lake, otherwise called Flat river); and that she have judgment for $1,000, said to have been expended in improvements. Some objection was made to this last pleading, but, in view of the fact that the defendant, by its answer, has converted the plaintiff's jactitation suit into a petitory action, in which it occupies the position of plaintiff, whilst the original plaintiff is practically made defendant, we think it was permissible.

Assuming the burden of establishing the title set up by it, the defendant shows that upon May 7, 1852, there was approved to the state of Louisiana, under the acts of Congress entitled "An act to aid the state of Louisiana in draining the swamp lands therein," and "An act to enable the state of Arkansas and other states to reclaim the swamp lands within their limits," approved March 2, 1849, and September 28, 1850, respectively, and agreeably to the official survey of date December 14, 1839, a list of lands, including the whole of section 4; the N. ½ of section 9; and the E. ½ and N. W. ¼ of section 10, in township 16 N., range 12 W. The act of 1849, as appears from its title, was intended to apply exclusively to the state of Louisiana, and its purpose will be best explained by the act itself, which reads as follows (italics by this court):

"Section 1.   *   *   *   To aid the state of Louisiana to construct the necessary levees and drains to reclaim the swamp *and overflowed* lands therein, the whole of those *overflowed and swamp* lands, which may be, or are, found to be unfit for cultivation, shall be, and the same are, hereby granted to the state.

"Sec. 2.   *   *   *   As soon as the Secretary of the Treasury shall be advised by the Governor of Louisiana that the state has made necessary preparation to defray the expenses thereof, he shall cause a personal examination to be made, under the direction of the Surveyor General thereof, by experienced and faithful deputies, of all swamp lands therein, which are subject to overflow and unfit for cultivation, and a list of the same to be made out and certified by the deputies and Surveyor General to the Secretary of the Treasury, who shall approve the same, so far as they are not claimed or held by individuals, and, *on that approval,* the fee simple to said lands shall vest in the state of Louisiana, subject to the disposal of the Legislature thereof.

"Sec. 3.   *   *   *   In making out a list of these swamp lands subject to overflow and unfit for cultivation, *all legal subdivisions, the greater part of which is of that character, shall be included in that list,* but

when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom: *provided, however* that the provisions of this act shall not apply to any lands fronting on creeks, bayous, watercourses, etc., which have been surveyed into lots, or tracts, under the acts of March 3, 1811, and May 24, 1824: *provided, further,* that the United States, shall in no manner be held liable for any expense incurred in selecting these lands and making out the list thereof, or for making any surveys that may be required to carry out the provisions of this act."

In the act of 1850 the name of the state of Arkansas appears instead of that of the state of Louisiana, but the benefits of the act are, by its terms, extended "to each of the other states of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated." The duty of approving the lists is imposed upon the Secretary of the Interior (instead of the Secretary of the Treasury), who is required to issue patents for the lands selected and approved; and the provisos, as contained in the third section of the act of 1849 are omitted. In all other respects the two acts are identical. The case of McDade v. Bossier Levee Board, 109 La. 626, 33 South. 628, arose out of a difference between the present defendant, claiming under the identical title here relied on, and a proprietor holding surveyed lands adjacent to Red Chute Lake in other sections of the same township as those held by the present plaintiff, who set up title to the lands there in controversy upon grounds identical in many respects with those relied on by the plaintiff now before the court; and it was there held by this court that the relicted land had been acquired by the state under the acts of Congress of 1849 and 1850 and by the selection and approval of May 7, 1852; that the state had conveyed said lands, by the act of the General Assembly No. 89, p. 113 of 1892, and by the formal deed executed pursuant thereto by the State Auditor and Register of the State Land Office to the Board of Commissioners of the Bossier Levee District (present defendant); and that the plaintiff McDade, had acquired no interest in the same, whether by purchase, accretion, reliction, or otherwise, but was a possessor in bad faith.

To what was said in that case we have now but little to add. It will be observed that the act of Congress of 1849 provides, and such, also, is the language of the act of 1850, that "in making out a list of these swamp lands, subject to overflow and unfit for cultivation, all legal subdivisions, the greater part of which is of that character, shall be included in that list, but when the greater part of a subdivision is not of that character, the whole of it shall be excluded."

There can be no doubt as to the meaning of this language, and, inasmuch as the N. ½ of section 9 and the E. ½ and N. W. ¼ of section 10 were included in the list selected and approved, there would seem to be no basis whatever for the argument that the state did not acquire the whole of those subdivisions, or that she acquired the swamp or overflowed lands as accessory to the other. On the contrary, we are bound to presume that the law was complied with; that the greater part of the lands in the subdivisions so selected and approved were of the character contemplated by it; and, as its main purpose was to convey swamp and overflowed lands, or swamp lands subject to overflow, it cannot reasonably be said that such lands were acquired as accessory to lands not of that character, and which were included in the conveyance only to avoid the breaking up of the legal subdivisions of which they formed the smaller part.

The defendant, having thus traced its title to the whole of the subdivisions containing the lots in dispute, the right of the plaintiff to hold those lots depends upon her ability to sustain, by proof or otherwise, the propositions, or some one of them, as set forth in her pleadings.

1. Her first proposition thus set forth is "that she is the owner of said lands, or lots * * * by right of alluvion, dereliction, accretion, or avulsion, same having gradually formed and become attached to the adjacent lands, the property of your plaintiff, and by virtue of her riparian rights said strips of land or lots became her property."

Upon the trial of the case in the district court the main purpose of the testimony offered on behalf of the plaintiff seems to have been to show that the land in dispute is not alluvion, or relicted land; that it has not been gradually formed, and has not been

acquired by accretion or avulsion. And in the printed argument submitted to this court the proposition above quoted is distinctly repudiated and abandoned, as follows (quoting from brief):

"The points at issue are wholly different from the contentions made in the case of McDade v. Bossier Levee District, 109 La. 626, 33 South. 628. In that case the contention was that the land involved was a shallow lake in 1849, and, under the ruling of the Land Department, did not pass to the state, and, if it did, that the plaintiff had acquired it by accretion; and that the land had never been surveyed and certified to the state. On page 628, 109 La., page 629, 33 South., McDade's contention is thus stated: 'Plaintiff has been in possession for several years. He claims title by accretion or reliction, he having been the owner of the land bordering on the lake at the time that its bed became dry land.' At the foot of page 629, 109 La., page 629, 33 South., the court says: 'The first [contention] is that, the bed of this lake not having been conveyed, it did not pass to the state under the selection and approval in question;' and again, on page 632, 109 La., page 630, 33 South., the court says: 'We concede the contention of the plaintiff that the evidence shows conclusively that the land in question was covered with water, or a lake, in 1850.' We make none of these contentions. On the contrary, we contend that the land involved was not the bed of the lake, but the banks of a stream, and that it passed to the state, under the swamp-land act, by the certificate issued to the state for the N. ½ of S. 9, and the E. ½ and N. W. ¼ of S. 10, T. 16, R. 12; and that it passed to the author by the purchase of the lots fronting on the bayou as a narrow strip of land lying between the meander line and the bank of the bayou."

2. Plaintiff's next proposition is thus stated in her pleadings:

"In the event it be held that said strips of land are not alluvion, accretion, dereliction, or avulsion, and that the state acquired same under and by virtue of the acts of Congress of 1849 and 1850, as swamp and overflowed land, then, and in that event, your plaintiff avers that the strips of land in controversy * * * lie along and constitute the banks of a meandered stream (sur-

veyed and meandered, by authority of the United States, by the Surveyor General of the United States for the state of Louisiana, and duly approved on December 14, 1839, and designated on the maps and plats of the United States as 'Red Shoot Lake,' but known in the neighborhood as 'Flat River'), between the meandered line and the edge of the water, and constitute the water front of the surveyed lots of your plaintiff lying within the meandered line of said stream; that said meandered line is not, and never was, the boundary of said lots of land under said United States survey, but under the laws of Congress, the authority of the Secretary of the Interior, and the rules and regulations of the Land Department, was run only as a means of measuring the land to be disposed of by the government and paid for; the water's edge being the boundary of said lots under said United States survey, and the lands between said lots and said water's edge passed with the sale and transfer of said lots under the laws of the United States and regulations adopted thereunder as part thereof." Plaintiff further avers that she acquired said surveyed lots, including the water front as part thereof, "by partition between herself and her coheirs, in the succession of her father, A. Lattier, who purchased the same from the state of Louisiana," and she then advances another proposition, which will be considered later. The title thus set up by the plaintiff traces back in part to a patent issued to her grandfather by the state of Louisiana, which reads as follows:

"Patent No. 8,679. July 31st, 1860. Francois Lattier, Patentee of Parish of Bossier. Description of land patented: Lots 3 and 4 of Section 9 and Lots 1, 2, 3 and 5 and S. E. ¼ of Sec. 10; T. 16; R. 12 W.; containing 382.06 acres. N. Western Land District.

"Certificate No. 9168. N. S. H.—Swamp Land."

The land thus patented was located, under the authority of Act No. 247, p. 306, of 1855, "as the swamp or overflowed lands granted by acts of Congress of 2d March, 1849, and 28th September, 1850," and agreeably to the government survey of December 14, 1839, to which the plaintiff refers in her pleadings; and the same statute (Act No. 247, p. 306, of 1855) provides that any shallow lakes which have become the "property of the state and

are susceptible of being reclaimed, wholly or in part, and not navigable, the area of which has been ascertained by survey recognized by the state, may also be sold under the provisions of this section. No land shall be sold for less than one dollar and twenty-five cents per acre." Plaintiff's grandfather therefore purchased 382.06 acres of land at $1.25 per acre, and, as the plaintiff shows, purchased with reference to the survey of 1839, agreeably to which the state had acquired the property from the United States.

In 1866, Francois Lattier sold to Adolph Lattier (plaintiff's father) the land which he had thus acquired, and also the N. W. (fractional) ¼ and the W. ½ of the N. E. ¼ of section 8, and in 1855 the four heirs of Adolph Lattier (including the plaintiff) effected a partition by which each of them took in severalty a tract 10 chains in width (from north to south), running from west to east entirely across sections 8, 9, and 10, the four tracts embracing the entire northern halves of those sections, and containing, according to the act of partition, 782 acres, more or less. Where the parties acquired the E. ½ of the N. E. ¼ of section 8, or any land north of Red Shoot in the N. E. ¼ of section 9, or where Francois Lattier acquired the N. W. fractional ¼ and the W. ½ of the N. E. ¼ of section 9, which he included in the sale to Adolph Lattier, is not shown.

Referring to the subjoined sketch, which is a copy (of the copy) of the government sur-

vey of 1839, with subdivisions added, as indicating the tracts said to have been acquired by the heirs of Adolph Lattier in their partition proceeding, and as indicating the particular lots here in controversy, it will be seen that the plaintiff and her coheirs are already in possession of considerably more land than their titles call for. Thus the patent to Francois Lattier called for 382.06 acres, but according to the survey it appears that he actually acquired 454.46 acres, and it is conceded that his heirs and their assigns are now in possession of all that he acquired. It will be observed that the position which we are now considering is in hopeless conflict with that contained in the plaintiff's first proposition, for, if it be true that the land in controversy is alluvion, or relicted land, and that it has been so acquired by plaintiff and her authors since Francois Lattier obtained his patent, it cannot be true that it was at that time dry land, lying between the meander line and the water's edge. Considering the position upon its merits, however, it is plain that, if the land in dispute had been of the character which the plaintiff now says that it was, her author would have paid for the acreage shown on the patent plus that contained in the tracts in dispute; that is to say, instead of paying for 294.46 acres, as contained in lots 3 and 4 of section 9, and 1, 2, 3, and 5 of section 10, he would have paid for 405.98 acres, which is the measurement of those lots when the lots in dispute are added to them. Again, the plat of survey upon which the plaintiff relies as part of her title shows that the lots in dispute were not surveyed when her author obtained his patent, and, if they then formed the bottom of a shallow lake, they could not have been sold, since under Act No. 247 of 1855, such land could be sold only after the area had been ascertained by a survey recognized by the state; and by the express language of the act of Congress of 1849 the lands thereby granted were subject to be disposed of by the Legislature. If, upon the other hand, as plaintiff now contends, the lots were then dry land along the banks of a stream, how are we to account for the fact that they were omitted when the government officials were surveying dry land, and that the stream was meandered at a distance of from 10 to 20 chains from its border; and, more unaccount-

able still, why should the plat of the survey, which the plaintiff, though setting it up as a muniment of title, is endeavoring to impeach, show that the stream or slough was meandered at the water's edge? The oral testimony offered to sustain the theory propounded—i. e., that there was a strip of dry land from 10 to 20 chains wide between the meandered line and the body of water meandered—like the theory itself, was inadmissible, because in conflict with a position which the plaintiff had already taken. Having been admitted, however, it fails of its purpose, the conclusion which we reach upon the question of fact being that the water adjacent to which the plaintiff's author bought his land was a mere slough, possibly two or three miles long, in the middle of a swamp or body of land subject to overflow, forming part of certain larger bodies of shallow water, indifferently called Red Shoot and Red Shoot Lake, serving to carry their contents sometimes in one direction and sometimes in another, and which, together with the body of which it formed part, depended for its supply of water upon excessive rain and upon overflow from Red river, or some other stream connected with the permanent water ways of the country. It was included in the following description, given in the McDade Case, of Red Shoot Lake, to wit:

"The lake lies diagonally across the northeast corner of the township. It is about seven miles in length by a width varying from a few acres to about a mile, its area being 1,077 1/7 acres." McDade v. Bossier Levee Board, 109 La. 630, 33 South. 629.

3. Plaintiff's next proposition is that:

"If it be held that said state [of Louisiana] acquired said strip of land * * * from the United States, and that the same was land at the date of the swamp-land grant of 1849 and 1850, then * * * that said state acquired and received title to said strip of land constituting the water front by virtue of patents issued to it for the adjacent surveyed lots, and said state, having disposed of said lots with reference to said survey and the plats made thereunder, conveyed all the lands so acquired by it on and along said stream to plaintiff and her authors, and the said state and its so-called transferees are now estopped from disputing or contesting the transfer so made, or the riparian rights

of plaintiff so acquired, and the attempt * * * to dispose of said strips of land impairs the obligation of the state's contract of sale with this plaintiff and his authors, in violation of the Constitution of the United States."

It seems enough to say with reference to this that the state did not acquire the swamp lands granted to her under the acts of 1849 and 1850 "by virtue of patents issued to her for the adjacent surveyed lots." Quite the reverse. Nor did the sales by her of the surveyed lots carry with them title to the adjacent swamp lands, which, under her Act No. 247, p. 306, of 1855, could not have been sold until surveyed.

4. "She further avers, in the alternative, if it be found that she is not the owner of said land, by accretion, alluvion, etc., and if it be held that she and her authors did not acquire said strip in the manner aforesaid, and that the same was the property of the state of Louisiana, then * * * that by Act No. 21, p. 31, of 1886, the Legislature * * * gave to those in possession of state lands the right to enter the same by preference over all others, at the legal price of 75 cents per acre, and that long prior to the passage of Act 89, p. 113, of 1892, purporting to grant certain state lands to said defendant, and at the time of the passage of said act, and ever since, and now, the plaintiff and her authors were and are in possession as owners of said strip of land, and had and have a vested legal right to purchase said land at said price," etc.

The evidence does not sustain the allegation as to the date at which the plaintiff took anything like actual possession of the land in question, and we adhere to the view, expressed in the McDade Case, that after the passage of Act No. 89, p. 113, of 1892, it was not competent for persons to acquire any rights to lands, within the limits of the Bossier Levee District, under Act No. 21, p. 31, of 1886, granting pre-emption rights to actual settlers.

5. "She further avers, in the alternative, that, if it should be decreed that the defendants are the owners and entitled to the lands between the traverse lines of said Red Chute, or Flat river, then, in that event, she represents that an error was committed in making the field notes and maps of the survey, whereby said river purports to be located some distance west of where it was at the time of said United States survey and west of where it now is; that said river or chute was then where it is now, and that natural monuments govern measurements; and that, if said board recovers the land between said traverse lines, it should be located so as to embrace the channel and banks of said Red Chute, or Flat river."

The plaintiff and defendant acquired by, and rely on, the same original survey and plat of survey, according to which the plaintiff's lands were located on the border of Red Chute Lake. Since her acquisition the lake has receded, and the land lying between the original and the present border has been relicted. It is that land which forms the subject of the present controversy. We are unable to discover in what way its identity can be affected by any supposed mistake in the survey to which the plaintiff refers, since she has all the land called for by her title, and can take no more unless she takes the relicted land, to which, for the reasons here given, we think the defendant entitled.

6. The plaintiff claims the value of certain clearing done by her, and of two houses erected within the past five years upon the land in dispute. She was allowed the amount claimed for the houses, and, as to her other claim, as also that of the defendant for rent and for damages, the parties were relegated to another action. The defendant, answering the appeal, prays that the plaintiff's claim for the value of the cabins be also disposed of in that way. We are constrained to hold that the plaintiff is a possessor in bad faith, and we think that the prayer should be granted.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended in so far as to reject, as in case of nonsuit, the claim of the plaintiff for the value of the houses, and, as amended, affirmed, at the cost of the appellant.