DAWKINS, J.
The board of commissioners of the Atehafalaya Basin levee district seek by mandamus to compel the auditor and register of the state land office to execute in favor of plaintiff board deed or deeds to certain property situated within the boundaries of the said levee district, and claimed by it under the provisions of section 11 of Act No. 97 of 1890, by which act the said levee district was created and the said board was made a corporation or body politic, Plaintiff alleges that the property in- controversy (consisting of the beds of Little Lake Long, Lake Rond, Lake Dauterive, and Lake Fausse Pointe) was acquired by the state under the Swamp Land Acts of Congress (Act March 2, 1849, 9 U. S. Stat. at Large, p. 352, c. 87, and Act Sept. 28, 1850, 9 Stat. at *97 Large, p. 519, c. 84 [U. S. Comp. St. §§ 4958-4960]), and by it, in turn, granted to tbe plaintiff under said Act No. 97 of 1890, but that no deed thereto bad been executed by tbe auditor and register as required by law; bence tbe prayer was that defendants be ordered to make deed to it in compliance with said act.
Tbe Atcbafalaya Land Company intervened in tbe proceeding, and, while joining plaintiff in tbe contention that the property bad been acquired and conveyed in the manner indicated, it alleged that' tbe same bad been, through mesne conveyance, acquired from said board, and is now owned by inter-vener, and prayed that patent be ordered issued in its favor in lieu of tbe board. In-tervener further alleged that whether acquired by congressional grant, or owned by tbe state in virtue of its sovereignty, said property, being, by nature susceptible of disposal, bad been by tbe state conveyed to plaintiff board by said act No. 97 of 1S90, and in turn sold by tbe latter to intervener. It further alleged that tbe Governor bad attempted to lease portions of said property to other persons for mineral purposes, and that it bad instituted appropriate legal proceedings to test tbe validity of said action; that tbe attempted leasing of the lands for mineral purposes by tbe Governor violates tbe Fourteenth Amendment to the federal Constitution and deprives intervener of its property without due process of law; that tbe state, through its executive, legislative, and judicial departments, has always recognized these lake bottoms as falling within tbe grants to the various levee boards, and is estopped to take a different position at this time, and which estoppel intervener specially pleaded.
Interventions were also filed by Geo. L. Eastabrook and H. Kendall, claiming to be assignees or transferees of mineral leases of said property, emanating from tbe Governor under authority of Act No. 30 of tbe Extra Session of tbe Legislature of 1915, and asking that their rights be recognized and maintained. However, it is noted in the record that, whatever may be the outcome of this litigation, tbe successful party will recognize the rights of these intereveners, and an adjudication of their claims has therefore become unnecessary.
The auditor and register appeared through the Attorney General and resisted the demands of plaintiff board, upon the grounds, first, that section 11 of Act No. 97 of 1890 violates article 58 (formerly article 56 of the Constitution of 1879) of the Constitutioof 1S98, in that it attempts to donate the property of the state to a public corporation. In the alternative, the auditor and register averred that it was the intention of the Legislature by said act No. 97 of 1890, to grant only such lands within said levee district as had been originally conveyed to the state by Congress under the Acts of 1849 and 1850, and such other lands as might thereafter be forfeited for taxes. They denied that the so-called lands involved in this litigation were included in said grants of 1849 and 1850, or were “swamp and overflowed” lands within the meaning of said acts, and further averred that the so-called lands were the beds of navigable streams and lakes, and belonged to the state by virtue of its inherent sovereignty, and were not then and are not now susceptible of private ownership. They further averred that plaintiff has never applied to them or their predecessors in office for a deed or deeds confirmatory of the so-called grant under section 11 of Act No. 97 of 1890; that no selection thereof has been made, and until such selection and application defendants cannot give and plaintiff cannot receive title to said property.
The auditor and register also answered the intervention of the Atcbafalaya Land Company with practically the same defenses *99 as these made to the demands of the plaintiff board; denied that it had been the policy of the state to recognize the bottoms of such lakes as swamp lands, or that it was in any wise estopped in the premises. They further averred that, if title had been conveyed by plaintiff to intervener and its vendors, the same was null and void for want of a sufficient description of the property; that no selection or demand was ever made by the levee board for a conveyance, and that none had been made by interveners or their vendors; and that by such failure and laches on the part of said board and its purported transferees, and by the failure of said transferees to obtain title and render said property for assessment and taxation for more than 17 years, and until the same had become valuable for mineral purposes, they had forfeited all rights or claims which they may have had thereto, both in law and in equity, which forfeiture defendants specially pleaded. The prayer comports with the averments of the answer.
Plaintiff board answered the intervention of the Atchafalaya Land Company, admitting that it (the board) had acquired the property in dispute from the state under Act No. 97 of 1890, but denying that it had conveyed the same to intervener. It further averred that if it should be found that said property was intended to be included in the contract with intervener’s vendors the same was a mere option, and all rights thereunder had been forfeited by laches and inaction for more than 17 years, and intervener for that reason is estopped to claim the same, which estoppel plaintiff also specially pleaded.
The court below gave judgment for defendants auditor and register, and rejected the demands of plaintiff board and inter-vener, Atchafalaya Land Company, “for the reason that the court has reached the conclusion that the lands involved in said cause were acquired by the state by virtue of its sovereignty, and that the lands so acquired by the state are not covered by the grant of the state to the board of commissioners of the Atchafalaya Basin Levee District.”
The judgment of the lower court also sustains the claims of Mason James, George Hastabrook, and H. Kendall, interveners, under their mineral leases emanating from the Governor, but we are unable to find in the record any intervention on the part of Mason James.
Plaintiff, board of commissioners of the Atchafalaya Basin levee district, and inter-vener, Atchafalaya Land Company, have appealed, and the auditor and register have answered the said appeals, averring that the lower court had failed to pass upon their plea of unconstitutionality of section 11 of Act No. 97 of 1890, to the effect that the Legislature is prohibited .by article 58 of the Constitution of 1898 (formerly article 56 of the Constitution of 1879) from donating the property of the state to private or public corporations, and asking that said plea be sustained.
The evidence in this record is very indefinite on many important points affecting the nature and character of the property in dispute. We find it admitted that all of the lands surrounding Lakes Rond, Dauterive, and Fausse Pointe, and Little Lake Long, are of the “swamp and overflowed” character contemplated and embraced in the grants by Congress of 1849 and 1850, but this admission does not include, in our opinion, the bottoms of those lakes. According to “Darby’s Map” of Louisiana, made at Philadelphia, Pa., in 1816, found in the record as Exhibit D 8, what now appears to be Lake Fausse Pointe and Grand Lake, was treated as one body of water, and designated as “Lake Chetimaches,” and the Atchafalaya river was definitely outlined thereon from its present source, running in a general *101 southeasterly direction some distance north and east of the upper portion of Lake Gheti-maches, and emptying into its lower or southeastern end, or what is now apparently the eastern end of Grand Lake. It seems to have passed through what is now Lake Rond, but' that body of water is not separately named on said map, and small bayous or streams appear to radiate from it and the Atchafalaya river to the northern end of Lake Ohetimaches, or what is now Lake Dauterive. We are unable to locate Little Lake Long on this map at all, and there is nothing to show the depth of the water, though we note in the northwestern end of Ohetimaches, now called Lake Fausse Pointe, what seems to have been an island. There is, of course, nothing in the record to advise us as to whether or not Lake Ohetimaches was navigable at that time.
We next find in the record certified copy of a map or survey, purporting to have been made by the United States Surveyor General, received in evidence under the following stipulation:
“Mr. Burke: The plaintiff and intervener have undertaken to establish the survey of the United States government surveyors in 1833-1834, or thereabouts, of all of the lands in townships 11, 12, and 13 south, range 8 and 9 east, being lands surrounding Lake Rond, Lake Dauterive, Lake Fausse Pointe, and Little Lake Long, and also that the said surveys had been approved by the Surveyor General, and that the said lands had been selected by the state of Louisiana and certified to it by the Commissioner of the General Land Office at Washington. There was tendered in lieu thereof a map, and accepted by the defendant as covering the entire project, which is marked ‘P. I. D.’; and the said map is admitted to represent the lands as surveyed, approved, and selected and certified, and the lakes in the condition which they were at the time of said survey, with the meanders of said lakes. It is further admitted that the said lands indicated on said map as surrounding the lakes indicated are all swamp lands, and that the same were included in the transfer to the state under the swamp land grants of 1849 and 1859, with the explanation further that there appears on said maps some concessions which had been made anterior to the swamp land grant.”
This map or survey is labeled “Southwestern District of Louisiana,” and is certified by the register of the state land office as a “correct extract from the records of the late United States Surveyor General’s office, now a part of the records of this office.” It purports to represent a correct survey of townships 10 south, range 8 and 9 east, 11 south, range 8 and 9 east, 12 south, range 8 and 9 east, and 13 south, range 8 and 9 east, being the lands surrounding the four lakes whose beds are in controversy in this case, as well as a portion of Lake Grand, but the body of water representing Lake Dauterive is not so labeled thereon, and appears to be treated as a part of Lake Fausse Pointe. The township and section lines are not extended across any of these lakes, but the shores are meandered, and wherever any portion of a section is shown, it bears the proper number and the amount of acreage surveyed as land. The space within the meander lines is designated as lakes, but there is nothing to show their depths, or whether or not they were at that time navigable. We take it from the admission made in connection with the offering that the survey was made by the United States Surveyor General about 1832-1834.
The intervener, Atchafalaya Land Company, has also filed in evidence a sketch on map of this same territory, made by one Walter Y. Kemper, civil engineer, marked “Intervener 1,” which, according to this witness’ testimony in the record, represents a survey made by him at the instance of the intervener shortly before the trial for the purposes of this suit, and on which he has extended the township and section lines (not by actual survey, but by triangulation) across all' of these lakes. He also made soundings of the bottoms of the lakes, which *103 show their depth as varying from 2/10 to 93/j.o feet, as will appear from the figures placed on the map at the points where the soundings were made. This map also shows a large portion of the upper end of Lake Pausse Pointe, and nearly two-thirds of the eastern half of Lake Rond, as land, and this fact is further fortified by numerous photographs of the land and vegetation growing .thereon, consisting principally of willow trees. The evidence also shows that this land is from a few inches to 3 and 4 feet above the low-water level of the lakes. Lake Pausse Pointe, according to the survey of the Surveyor General of 1S32-1834, was from 10 to 12 miles long, and from 2 to 6 miles wide, but the northern half is rapidly filling up from the east, and on the deeper or western side the distance from the land so formed to the western shore varies from one-half mile to a mile, and its depth from 2 to 6 feet. We also find from a rough computation made on the basis of the survey of the Surveyor General above referred to that the sizes of the other' lakes in controversy were about as follows: Lake Rond, egg-shaped, about 3 miles long, and varying in width from Vi 0 to 1% miles, and connected with Lake Pausse Pointe by Bayou Providence or Grand Bayou, and with Lake Dauterive by Bayou Benoit and Bayou Grand Gueule; Lake Dauterive, oblong in shape, from 2% to 3 miles in length, from a few yards to about 1 mile in width, being about one-fourth mile wide, where it connects with Lake Pausse Pointe on the southeast, its waters at this point converging with those of Bayou Providence or Bayou Grand, which leads north to Lake Rond as above indicated; the depth of Lake Dauterive varying from 1*/10 to 8 feet. We are not furnished with the depth of any of the bayous above mentioned, but it is stated that they are deeper than the lakes. Little Lake Long is shaped somewhat like a butcher’s cleaver, a little over 3 miles in length, and varies in width from about one-fourth mile at the north, or handle, end of the cleaver to a mile through its widest part, has an island at its lower end or mouth of some 50 or 60 acres, and connects through narrow passes on either side of the island with Lake Grand on the east or southeast; on the north or northwest it is connected with Lake Pausse Pointe by Bayou Gravemberg and the south end of Bayou Eugene; it varies in depth from V10 to 45/io feet.
All of these lakes form a connected system, whose upper or northern end unites, through various baj'ous and lakes, with the waters of the Atchafalaya river (the Atcha-falaya river seeming to lose its identity in the many bayous and streams some distance north of the head of these lakes) and on the south or southeast, the waters of all find their way through Grand Lake, Six-Mile Lake, and the Lower Atchafalaya river (which reappears) into the Atchafalaya Bay, and thence into the Gulf of Mexico.
[1] The islands or lands above mentioned as being in Lakes Rond and Pausse Pointe have been formed within the past 25 years, mainly from the sand or silt deposited there by the waters coming down from the Atchafalaya river, and since the construction of the levees along said river by the plaintiff board. The record also discloses that the waters of all of these lakes have, as far back as the knowledge of the witnesses goes, been used by steam and gasoline boats in towing timber out to the sawmills south of these lakes from the surrounding lands. During the low-water season of the late summer and fall principally gasoline boats are used, but portions of the lakes are used the year round by the latter. During the winter and spring, and possibly the early summer — the high-water season — both steam and gas boats are used, not only in the lakes, but in many instances over the surrounding *105 country lor a distance of several miles. Little or none of the adjoining lands are used for agricultural purposes, but just how far back from the lake shores the farms begin is not shown by the record. The proof is that in order to make the lands immediately surrounding the lakes available for farming, very high levees would have to be built, which, of course, would make the waters of the lakes deeper, and therefore more available for navigation. According to the record, the tides ebb and flow regularly in all of them. There is no effort made to show that the beds of these lakes can be made available for farming purposes, either by leveeing or draining, except such portions as may be built up from deposits of the waters flowing from the Atchafalaya river, above referred to. We take cognizance of the fact that the Atchafalaya river is a navigable stream, although there is no evidence on that point in the record, and the fact that these lakes, together with .others further east and south form the outlet, for its waters to the Gulf, is not seriously disputed. Therefore, if the beds of these lakes are ever made available for habitation and agriculture, it will not be through the artificial processes of levees and drains, but by the work of nature in building up and filling them in, as much of the lands in the southern end of the state have been built.
[2] While the Congress, in admitting Louisiana into the Union, undoubtedly retained title to all of the “waste lands” then existing, and the state accepted this reservation as a condition attached to its admission, the government did not and could not retain the ownership of lands which did not exist as such at that time any more than it did or could retain title to the islands which have since formed off the shores of this state in the Gulf of Mexico, or in the Mississippi.
In our opinion, the whole theory upon which the government conveyed these “swamp and overflowed” lands to the states was that, as the property then stood, it was susceptible of reclamation, through artificial means, or the efforts of man; and, as a condition of the transfer, it was required that the proceeds should be devoted to that end. The lands were none other than those which Congress had required the state of Louisiana to relinquish to the United States, under the terms of its admission into the Union, as “waste lands.” In other words, the purpose was to offer an inducement to the states, and through .them to their citizens, to reclaim and render productive property which otherwise was of little value to any one in its then condition. Necessarily, the scheme involved only such property as the government had title to at that time.
[3,4] However, the beds of navigable streams, lakes, etc., never belonged to the United States, but are the property of the states in virtue of their inherent sovereignty. Barney v. Keokuk, 94 U. S. 338, 24 L. Ed. 224; Packer v. Bird, 137 U. S. 666, 11 Sup. Ct. 210, 34 L. Ed. 819; Water Power Co. v. Water Com., 168 U. S. 361, 18 Sup. Ct. 157, 42 L. Ed. 497; Hardin v. Jordan, 140 U. S. 382, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Sapp v. Frazier, 51 La. Ann. 1718, 26 South. 378, 72 Am. St. Rep. 493; Hall et al. v. Board of Com. Bossier Levee Dist., 111 La. 913, 35 South. 976; Perry v. Board of Com. Caddo Levee Dist., 132 La. 422, 61 South, 511. Therefore, once a body of water is found to be navigable, it follows that the bed or bottom must be held to be the property of the state. See, also, exhaustive annotation, State v. Korrer, L. R. A. 1916C, 150 et seq. What, then, is navigable water? It is that which, by its depth, width, and location is rendered available for commerce, whether it be actually so used or not. Under the common law of England, only such waters as were within the ebb and flow of the sea were navigable in law, regardless of their *107 use by tbe vessels of commerce. That is not tbe law in tbis country; tbe question of navigation is one of fact, depending upon tbe evidence in each case. See authorities just cited.
[5] Neither do tbe beds of streams, lakes, etc., within tbe tidewaters of tbe sea belong to tbe United States, but, for tbe reasons just stated, are tbe property of tbe state.
[6] Consequently, no property which fell within either category, that is, tbe beds of navigable streams, lakes, etc., or those within tbe tidewaters of tbe sea, ever came under tbe operation of tbe Swamp Land Acts. All of tbe lakes, whose beds are involved in tbis case (with tbe possible exception of Little Lake Long), according to tbe record, are navigable (at least portions thereof) tbe whole year round, by small craft, and in high-water seasons all are navigable to steamboats, and are so used. They are all also .shown to be within tbe ebb and flow of tbe tides. It follows that they were not included in tbe swamp and overflowed lands granted by Congress to tbe state, and by tbe latter transferred to tbe Atchafalaya Basin levee district.
[7, 8] But tbe plaintiff, levee board, and intervener, Atchafalaya Land Company, contend that, even if tbe lake beds were not swamp and overflowed lands, within tbe meaning of those terms, nevertheless, they were by tbe state conveyed to plaintiff under tbe all-inclusive provisions of section 11 of Act No. 97 of 1890. We quote tbe portions of tbe section referred to which are pertinent to this contention, as follows:
“Section 11. Be it further enacted, etc., that in order to provide additional means to carry out the purposes of this act, and to furnish resources to enable said board to assist in developing, establishing and completing a levee system in said district, all lands now belonging, or that may hereafter belong to the state of Louisiana, and embraced within the limits of the levee district as herein constituted, shall be, and the same are hereby given, granted, bargained, donated, conveyed and delivered unto said board of levee commissioners of the Atchafalaya Basin levee district whether said lands or parts of lands originally granted by the. Congress of the United States to this state or whether said lands have been, or may hereafter be, forfeited to, or bought in by or for, or sold to the state, at tax sales for nonpayment of taxes. * * * ”
Even granting that it was tbe intention of the Legislature to grant to tbe levee board all lands, however acquired (which is quite doubtful, in view of tbe restrictive language as to swamp lands and tax purchases or forfeitures) it can hardly be said that tbis included land that was covered by navigable waters such as tbe beds of tbe Mississippi, Red, and other rivers. Tbis view is further emifhasized by tbe very statute (No. 124 of 1861-62) which tbe appellants cite in support of their contention, and in which tbe Legislature seems to have deemed it necessary to provide by legislative enactment that the beds of any and all lakes, subsequently becoming dry or land, should be swamp lands, in order to impress them with that character. Undoubtedly the Legislature is tbe authority vested with tbe power of disposing of tbe state’s property, within constitutional limitations, but it would seem clear that that body did not consider tbe beds of lakes such as those in controversy in tbis case swamp lands, to be disposed of as such until they became dry. Suffice it to say that, in our opinion, tbe beds of these lakes, according to tbe evidence, are not susceptible of reclamation for agricultural purposes.
We have examined tbe authorities and considered tbe matters and circumstances cited by tbe appellants as tending to show a policy of tbe state, through its executive, legislative, and judicial branches, to deal with such property as falling within tbe terms of tbe swamp land grants, and as belonging to the various levee boards, but do not think that contention is sustained. We find no case where tbe state has dealt with a situation, under circumstances in any wise *109 similar to those of the present controversy, and treated the beds of navigable lakes or streams, or those within tidewater, as lands. Certainly no such position has ever been taken with the present litigants, or in dealing with the property in dispute. On the other hand, the Atchafalaya Basin levee district and its transferees have remained silent and inactive for more than a quarter of a century in regard to the beds of these lakes, and have not seen fit to make their present contentions, or to apply to the respondents and appellees for a transfer under the act of 1890, apparently acquiescing in the theory that the property in dispute did not fall within the calls of their grants.
We think that the property involved in this litigation, that is, the beds of Bake Rond, Lake Fausse Pointe, Lake Dauterive, and Little Lake Long, belong to the state of Louisiana by virtue of its inherent sovereignty, and have never been bargained or transferred to the plaintiff.
This conclusion precludes the necessity of passing upon the constitutional questions raised by the appellees.
Judgment affirmed at the cost of appellants.
MONROE, C. J., takes no part.
PROVOSTY, J., recused.