14 So.2d 61

**AMERADA PETROLEUM CORPORATION et al. v. STATE MINERAL BOARD et al.**

No. 36909.

April 12, 1943.

Rehearing Denied May 17, 1943.

Eugene Stanley, Atty. Gen., and C. C. Wood and Edward L. Gladney, Jr., Sp. Asst. Attys. Gen., for defendants and appellants.

Porteus R. Burke and Jacob S. Landry, both of New Iberia, and Guidry & Willis, of St. Martinsville, for defendants and appellees.

McCoy & King and Liskow & Lewis, all of Lake Charles, for plaintiffs and appellees.

ROGERS, Justice.

This is an appeal by the Register of the State Land Office and the State Mineral Board from a judgment of the Sixteenth Judicial District Court for the Parish of·St. Martin rejecting the demands made by appellants in a certain concursus proceeding.

On joint motion signed by counsel representing the parties, the case was submitted for decision without oral argument, as provided by Section 8 of Rule XIX of this Court. Briefs have been filed on behalf of all parties to the appeal.

The Amerada Petroleum Corporation and the Phillips Petroleum Company, both Delaware corporations domiciled in the State of Oklahoma and doing business in this State, filed a joint petition in the district court for the Parish of St. Martin to provoke a concursus. The proceeding was instituted under the authority of Act No. 123 of 1922, and a number of persons, none of whom was a resident of the Parish of St. Martin and some of whom were non-residents of the State, were cited to appear and assert their claims to the funds deposited by the petitioners in the registry of the court.

Petitioners alleged that they were the holders of certain oil, gas and mineral leases from the State of Louisiana covering the bed of the arm of Grand Lake and other waters, and from the Schwing Lumber and Shingle Company and other per-

sons, claiming to own in indivision Lot 4 of Section 31, Township 11 South, Range 10 East. Petitioners set out the original leases and the assignments thereof from the respective lessors to the petitioners showing each petitioner to be the owner of an undivided one-half interest in the various leases therein described. Petitioners alleged that they drilled an oil well upon alluvion formerly forming the bed of an arm of Grand Lake and that the State of Louisiana, represented by the Register of the State Land Office and the State Mineral Board, claimed to own the one-eighth royalty stipulated in the lease executed by the State. Petitioners also alleged that the lessors named in the other leases described in the petition, and covering Lot 4 of Section 21, Township 11 South, Range 10 East, claimed that the alluvion belonged to Lot 4 and demanded that petitioners pay the one-eighth royalty to them. Petitioners prayed for citation of the claimants to the funds deposited by them in the district court and for a judgment fixing and determining the ownership of those funds.

The State Mineral Board and the Register of the State Land Office, representing the State of Louisiana, filed exceptions to the jurisdiction of the court ratione personae and ratione materiae. The exceptions were heard and overruled by the trial judge. Exceptors then filed a joint answer to the plaintiff's petition. The other defendants also answered the petition.

The case was tried upon the merits and resulted in a judgment in favor of the individual owners of Lot 4, the trial judge holding that the oil well was located upon the alluvion which had been a portion of the bed of Grand Lake, but by reason of the accretions in front of Lot 4, the owners of the lot acquired the ownership of the alluvion.

Appellants have abandoned the exception to the jurisdiction ratione personae, but, in their brief, they have alleged that the trial judge erred, first, in holding that the court had concurrent jurisdiction in a concursus proceeding with the court of jurisdiction of the funds deposited immediately prior to the deposit; and secondly, in holding that his court was vested with concurrent jurisdiction ratione materiae, because the fact that it is necessary to determine the location of the boundary line between the arm of Grand Lake and Lot 4, Section 31, Township 11 South, Range 10 East, Parish of St. Martin, does not make the proceeding an action of boundary, a jactitation suit, a possessory action, an action to try title, or a petitory action.

Contending that they have no interest as to which set of claimants is entitled to the one-eighth royalty, but that they are interested in maintaining the jurisdiction of the Sixteenth Judicial District Court for the Parish of St. Martin, plaintiffs have filed a brief seeking to uphold the judgment of the district court overruling appellants' exceptions.

The exceptions to the jurisdiction of the district court were heard on an agreed statement of facts by J. Cleveland Fruge, Judge of the Thirteenth Judicial District Court, acting under an assignment by this Court to the Sixteenth Judicial District Court in the absence of Judge James D.

Simon, who, under an assignment by this Court, was serving as one of the judges of the Court of Appeal for the Parish of Orleans. Judge Fruge's reasons for overruling the exceptions were embodied in a well-considered written opinion which has been filed in the record.

The pertinent portion of Act No. 123 of 1922, with respect to jurisdiction, reads: "Whenever any person, firm, partnership, corporation, or association of persons shall desire to deposit money as herein provided, an application shall be presented to the District Judge having jurisdiction, together with the money to be deposited, or a certified check therefor * * *."

The domiciles of the Register of the State Land Office and of the State Mineral Board, as fixed by Act No. 93 of 1936, as amended, are in the Parish of East Baton Rouge. Some of the numerous other claimants, who were cited to appear and assert their rights herein, are domiciled in the State of Ohio, some in the State of Texas, and some in various parishes of this State.

The Amerada Petroleum Corporation and the Phillips Petroleum Company are nonresident corporations with their local agents domiciled in different parishes of the State. They deposited in the registry of the district court the value of one-eighth of the oil produced from a well owned by them in the Lake Chicot oil field situated in the Parish of St. Martin. The funds deposited by them in the district court represent the royalty interests due under existing mineral leases to the mineral owners of the property on which the well is located, and the dispute among the various defendants arises on their respective claims to the title of this property.

We quote the following from the opinion of the trial judge in which the facts and the contentions of the parties are fully set forth, to-wit:

"It would appear, according to the allegations of the petition, that the well described therein is located on alluvion or accretion which was formed on the shore of the arm of Grand Lake in St. Martin Parish. The State, through the Mineral Board and the Register of the State Land office assert that this alluvion is owned by the State for the reason that it originally comprised the bed of Grand Lake, and it further contends that the owners of the property adjoining the arm of Grand Lake at this point could not acquire title to the accretion or alluvion. And, on the other hand, the owners of title to Lot 4 of Section 31, Township 11, South, Range 10 East, (being the property adjoining Grand Lake and the situs of the well) contend that the alluvion actually comprises a portion of lot 4, and therefore is owned by them to the same extent as is the original lot.

"It is therefore clear to the Court that this suit actually involves determination by this Court of the ownership of real property situated in the Parish of St. Martin, and the location of the property line between the arm of Grand Lake and the property or lot adjacent thereto. The question for this Court to determine at this time is an exception to the jurisdiction filed jointly, on behalf of the State, by the State Mineral Board and the State Land

Office, in that they contend that this Court has no jurisdiction ratione materiae, and also that it is without jurisdiction ratione personae. The exception alleges and the record also reveals that neither of the plaintiffs are residents of St. Martin Parish, nor are their registered agents for service of process located in that parish. Amerada Petroleum Corporation is a Delaware Corporation, and its Louisiana Agents are residents of Orleans Parish, Louisiana. Phillips Petroleum Company, another plaintiff, is also a Delaware Corporation, and its registered Louisiana Agent is domiciled in East Baton Rouge Parish. It would appear to the Court, therefore, that it is the contention of the exceptors that this suit can only be brought at the Louisiana domiciles of the plaintiffs, and that, therefore, this Court has no jurisdiction over the concursus action. The record also discloses that Amerada Petroleum Corporation does not maintain an office in Orleans Parish, where its agent of service for process resides. It is also shown by the record that Phillips Petroleum Company has no office or place of business in East Baton Rouge Parish where its agent for service of process is domiciled. It is further shown that the funds representing the value of the one-eight (1/8) royalty interest which is the subject of the concursus suit, are not held or paid from the Louisiana offices of the two companies, but that said funds are paid from the offices located out of the State of Louisiana. The above appear to be the substantial facts necessary to lay the foundation for a proper application of the law.

"It is the fundamental rule of jurisprudence that every person is entitled to be sued at his own domicile. This rule is announced in Article 162 of the Louisiana Code of Practice. It is the contention of exceptors that any exception to the general rule must be strictly construed. They further contend that Articles 163, 164, and 165 of the Code of Practice enumerate the exceptions to the general rule in Article 162. They take the position that there is nothing contained in the latter articles that could be made to apply to the facts as stated in plaintiffs' petition, and they contend further that the rule does not permit imagination in applying those exceptions, but that on the contrary, requires strict construction."

The trial judge, in his written opinion, discusses the case of the Louisiana Oil Refining Co. v. Williams, 170 La. 218, 127 So. 606, which is strongly relied on by appellants to maintain their exceptions. The trial judge correctly says that there is nothing that was said in the opinion in the Williams case which can be construed as holding that the court of the domicile of the plaintiff in a concursus suit brought under the provisions of Act No. 123 of 1922 is vested with exclusive jurisdiction of the case; that nothing is said in the opinion which indicates that such a suit can not be brought in the parish of the situs of the property from which the fund in dispute has been derived.

The trial judge points out in his opinion that there are numerous cases wherein concursus suits were brought at the situs of the

property rather than at the domicile of the plaintiff, which were finally disposed of on other grounds. From which the trial judge reasons that this Court has approved and recognized the right of the plaintiff in a concursus suit, involving the proceeds from an oil well, to file the suit either in the parish where the well is located, or in the parish where the plaintiff is domiciled. The suits to which the trial judge refers are the following: Superior Oil Producing Co. v. Forrestier, 185 La. 11, 186 So. 313; Shell Petroleum Corp. v. Carter, 187 La. 382, 175 So. 1; Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785; Placid Oil Co. v. Hebert, 194 La. 788, 194 So. 893; Standard Oil Co. of La. v. Hightower, La.App., 3 So.2d 472.

In Louisiana Oil Refining Company v. Williams, the plaintiff, a Virginia corporation operating an oil well in the Parish of LaSalle, maintaining its principal business in Louisiana in the Parish of Caddo, instituted a concursus proceeding in the district court of Caddo Parish in which plaintiff deposited the sum of $7,285 claimed by certain individuals who resided in different parishes. In that case this court held that, as plaintiff maintained its principal office in this State in the City of Shreveport, from which office it made its payments of royalties, the district court of the Parish of Caddo, in which Shreveport is situated, was vested with jurisdiction of the concursus proceeding, since, in the event any of the claimants was compelled to sue for the recovery of the royalty, his suit would have to be brought at the domicile of the custodian of the fund.

The trial judge correctly distinguishes the decision in the Williams case from the issues involved in this case in the following words:

"There is an important distinction which exists between the facts found to be present in the Williams case and those in the instant case, in that here the fund, or res, is not in Louisiana, but is being paid from sources outside of the State. It is the opinion of this Court that the situs of the property which constitutes the source of this fund is the proper jurisdiction. It is also obvious that while this suit, in its narrow sense, involves the ownership of the one-eight (1/8) royalty interest, that, in actuality, it requires a decision fixing the boundaries between the properties of the various defendants, and a determination of the ownership of real property before the ownership of the so-called one-eight (1/8) royalty interest can be determined."

After explaining the difference between the cases, the trial judge makes the following pertinent observations:

"It is well to note that should this Court divest itself of jurisdiction, and the contention of exceptors were upheld, it would then be necessary for the filing of two separate actions, one in the Parish of East Baton Rouge, and the other in Orleans Parish, interpleading all parties to assert their respective and identical claim to one-half (½) of the one-eight (⅛) royalty. If this were done, it can be readily seen that the defendants would undoubtedly present the same exception, or could do so, to the Court where the plaintiffs were attempting to adjudicate the entire con-

troversy at one time, and would argue again that since the suit was not filed at the domicile of one of the plaintiffs that plaintiff could not properly appear before the Court of the domicile of the other. That would result in an absurdity directly opposed to the purpose and spirit of the concursus statute, as announced particularly in Hennington v. Petroleum Heat & Power Company, 194 La. 188, 193 So. 583, (at page 586 of 193 So.) in the following language:

" 'In a concursus proceeding each claimant occupies a ,dual position of plaintiff and defendant with reference to the other claimants. Consequently, as the whole controversy is over the money deposited, none of the parties to the concursus proceedings. would have the right to obtain a judgment against the debtor, contradictorily with him alone or with his consent only, recognizing his lien on the funds, when such judgment might be said to bind the other claimants as being the law of the case. This would only cause confusion and prolongation of the litigation, instead of simplifying and speedily ending the same.

■ " 'Of course, this is contrary to the purpose and spirit of Act No. 123 of 1922, under which the parties litigant have acted in presenting the respective issues in the concursus proceedings to the court. The Act was passed in order to avoid a multiplicity of suits and actions, and contemplates a proceeding leading to one judgment, which finally adjudicates all the issues between all the parties.' "

On page 27 of appellants' brief, counsel quote an extract from paragraph (d) of subsection (6) of section 1 of Act No. 179 of 1918, embodied in section 1933 of Dart's Statutes, in support of their argument that a concursus proceeding can only be instituted at the domicile of the party making the deposit. The quotation as it appears in the brief is as follows:

"Where the corporation has established an office in a parish other than that where its agent for service of process resides, the venue of the suit shall, at the option of the plaintiff, be in either the parish where the cause of action arose, or in the parish of the residence of the corporation's agent for service of process, if the cause of action result from a trespass or an offense, or a quasi-offense but if the cause of action result from any other cause, the venue of the action shall be in the parish where the agent for service of process has his residence. * * *"

But it is to be observed that the quotation ends with the word "residence," followed by a comma, and omits the last three lines of the statute reading as follows: "unless the act or transaction from which the cause of action arose was wholly transacted or completed in some other parish where said corporation had and maintained an office."

■ The action or transaction from which this concursus proceeding arose was the drilling of, and completing as a producer, the oil well in the Lake Chicot oil field, because if it had not been for the performance of this act by the lessees of appellants there would not have been any occasion for a concursus proceeding. Under the allegations of the plaintiffs' petition

and, as shown by the admitted facts, the funds, or res, are not held or paid from plaintiffs' Louisiana offices, but from the offices located outside the State. The oil well is located in the Parish of St. Martin, and in order to determine the ownership of the funds derived from the oil produced therefrom, it is necessary to determine the ownership of the property on which the well is located. In view of these considerations, it is clear that the district court of the Parish of St. Martin is vested with jurisdiction of the cause.

On page 26 of their brief, counsel for appellants argue that, as the plaintiffs, Amerada Petroleum Corporation and the Phillips Petroleum Company, hold the mineral leases in indivision, they are jointly and solidarily liable for the payment of the royalties accruing from the leases. In support of the argument, counsel refer to section 6 of Article 165 of the Code of Practice, providing that where there is joint or solidary liability the defendants may be cited at the domicile of any of them. The argument is untenable.

The leases held by the plaintiffs are, by their terms and also under the laws of this State, assignable in whole or in part and are subject to sub-lease without the lessor's consent. As each of plaintiffs owns an undivided one-half interest in the leases, each is liable to the respective lessors for only one-half of the royalties accruing under the leases. The Amerada Petroleum Corporation is not liable for any portion of the one-half of the production falling to the Phillips Petroleum Company, nor is the Phillips Petroleum Company liable for any portion of the one-half of the production accruing to the Amerada Petroleum Corporation. It is clear therefore that if any lessor desired to institute a suit against the lessees jointly, the only court that would have jurisdiction of the cause is the district court of the Parish of St. Martin.

Our conclusion is that the judgment of the district court overruling the exceptions to the jurisdiction is correct and should be affirmed.

The case was tried on the merits before S. O. Landry, one of the Judges of the Sixteenth Judicial District Court for the Parish of St. Martin, who disposed of the issues involved in a written opinion, in which he ably analyzed the facts and discussed the applicable law.

The case was submitted to the trial judge for decision upon stipulations and admissions of facts. The facts, as shown by these stipulations and admissions, are substantially that the well, producing the oil from which the funds in controversy were derived, is located on land which was gradually and imperceptibly formed by accretions. This land is attached to and forms an extension of Lot 4 of Section 31, Township 11 South, Range 10 East. It was built up in water of what is designated as the arm of Grand Lake on an official map of the township made in 1932–33. The map refers to the water outside the meander line of Grand Lake, but it is admitted that this water should have been designated as the arm of Grand Lake. The silt or accretion which formed the alluvion was brought down by the waters

flowing from the upper Atchafalaya River through Bayou Nimrod and Chicot Pass which, at times, flowed in a northerly direction along the shore line of Section 31 and probably also through what is termed the arm of Grand Lake.

The map attached to the petition substantially shows that the meander line as established in 1832-33, and the land south of that line, was formed by accretions since the year 1859, in which year Lot 4 was patented. The land on which the well is located was formed by accretions subsequent to 1859 and has a general level of from two to five feet above mean gulf level. The water in the arm of Grand Lake has never receded and the average water level is now probably higher than at any previous time and was never lower than it was at the time of the official survey made in 1832-33.

The land was formed by accretions occurring at a higher rate after the year 1861. Because of the removal of a raft or log jam in the upper Atchafalaya River and because of the system of levees constructed through many years, the volume of water discharged through the Atchafalaya River and, in turn, through Bayou Nimrod, Chicot Pass, and what is termed the arm of Grand Lake, was greatly increased.

At Section 11, the arm of Grand Lake has a width between its banks of approximately 3,960 feet and opposite Lot Four it has a width of approximately 4,400 feet.

The map marked State "Defendant 3" exhibits a picture of the Atchafalaya River and all intermediate streams, lakes or bodies

of water between Simsport and Patterson, Louisiana, and thence, from Patterson to the Gulf of Mexico.

In 1812, the area where the oil well is located was covered by these waters. It is admitted that the photostatic copies of leases, assignment of leases, and subleases attached to plaintiffs' petition are correct. A like admission is made in regard to the statements contained in the petition as to the runs of oil and the value thereof. It is also admitted that the individual defendants and not the State of Louisiana are the owners of Lot Four.

We quote the following from the well-considered opinion of the trial judge:

"The main question for determination in this matter is, of course, the ownership of the funds deposited in the registry of the court by the plaintiff corporations. However, in order to decide this question it becomes necessary to determine the ownership of the land from which the oil was extracted.

"Concisely, the individual defendants claim title to the land by virtue of Article 509 of the Revised Civil Code which treats of accretions to land. This article provides as follows:

" 'Alluvion by accretion defined—Ownership.—The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.

" 'The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and

whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use.'

"On the other hand, the State contends that the arm of Grand Lake, as well as Grand Lake itself, is in fact a lake, and hence, the law of accretions as stipulated in said article of the Code does not apply.

"Therefore, stripped of all ancillary issues, the question for decision is whether the accretion mentioned to the land in question, belongs to the owners of the land to which it has become annexed, by virtue of Article 509 of the Civil Code, or, whether the meander line established in 1832–33 remains the permanently fixed boundary line between Lot 4 in question and the arm of Grand Lake, which belongs to the State of Louisiana, by virtue of its inherent sovereignty.

"Although a great deal may be said argumentatively on the law applicable to this question, I deem it unnecessary to burden the record with a lengthy discussion on this point.

"Counsel for the State and counsel for some of the individuals went to great lengths in discussing the case of State v. Erwin, 173 La. 507, 509, 138 So. 84 and the case of Miami Corporation v. State of Louisiana, 186 La. 784, 173 So. 315.

"I do not consider either of these cases as decisive of the question herein presented. Both of these cases discuss the applications of Article 510 of the Civil Code which applies to dereliction and not Article 509 with which we are concerned and which applies to accretion. It is true that there is similarity between these two articles, in that they both apply to rivers, streams or running water. Yet the question to be decided in this case is practically opposite to the question therein presented. In these cases the question for decision was regarding the loss to the landowner when the waters encroached upon his land; here we are considering whether or not the landowner will gain when these waters bring additions to this land.

"In the Erwin case the Court decided, by a divided Court, that the landowner's property line remained stagnant in spite of the encroachment by the water. In the Miami Corporation case, the contrary was held, again by a divided Court. Being the last decision on this point we should take it as controlling, but the Court was careful to state that it was not under authority of Article 510 that its decision was based, but under the Article of the Code dealing with public things, particularly Article 453 of the Civil Code. Therefore, this last cited case cannot be authority for a decision of the question confronting us.

"It is practically conceded by the contending parties herein that Article 509 with which we are concerned does not apply to lakes or bays or the sea. This is so because the decisions of the Supreme Court have so consistently held. The case of Zeller v. Southern Yacht Club, 34 La. 837, which so holds has been consistently followed.

"It naturally follows, therefore, that the law on this question is settled and clear.

It is contained in Article 509 and the several cases decided thereunder that accretions formed successively and imperceptibly on the shores of rivers or other streams, whether navigable or not, belong to the owners of the property to which they became attached, but that this is not the law in cases of lakes, bays and the sea. This being so the question for decision then naturally becomes one of fact, that is, is the arm of Grand Lake a lake, or is it a 'river or other stream?'

"There is no doubt that in the admissions and stipulations herein made regarding the navigability of the body of water in question in the year 1812 and at the present time, as well as the location of the meander line of 1832-33, that the State of Louisiana became the owner of all that portion of the bottom of the arm of Grand Lake beyond the meander line. There has been no claim advanced that the State divested itself of title thereto, and hence, if the individuals themselves own the same, it is only by the provisions of Article 509 relating to accretions.

"It is conclusively shown by the maps in evidence, as well as by the findings of our Supreme Court in the case of State ex rel. Board of Commissioners of the Atchafalaya Basin v. Capdeville, 146 La. 94, 97, 83 So. 421, that the Atchafalaya River, as such, loses its identity at some point north of the land in controversy and does not reform, to be identified, until at some point south of this land. On the map in evidence identified as 'State 4', it is shown where the Atchafalaya River loses its identity and divides at about the Parish line between

St. Martin and St. Landry Parishes and that the waters flowing therefrom gradually divide themselves into many bayous and bodies of water having considerable more width than bayous, until they all reunite again at the very foot of the map into one stream which is again identified as the Atchafalaya River. It must be judicially noted that the Atchafalaya River is a large, and at times, a violent stream. A great deal of water runs through it. This is especially recognized when consideration is given to the large amount of silt it has brought into this basin.'

"By comparison of the maps in evidence it is easily ascertained that a large volume of silt was necessary to form the extensive accretions that have manifested themselves during the period covered by these maps. It must also be noted that a large volume of water has continuously found its way through this basin, and that the stream carrying the water in this river must be considered as what we may term bodies of flowing water as distinguished from those containing dead or still water.

"With this understanding, let us then consider whether or not the bodies of water therein designated as lakes are in a legal sense lakes, or whether we might consider them as streams within the meaning of Article 509 of the Code."

The statement contained in the last paragraph of the quoted portion of the opinion of the trial judge is made obviously, because the State of Louisiana, through appellants, is asserting its ownership to the alluvion on which the oil well

is located solely on the theory that the body which has been designated as the arm of Grand Lake was a navigable lake in 1812, when Louisiana was admitted into the Union, is also navigable now, and that the laws establishing and regulating the ownership of alluvion do not apply to lakes.

After referring to and discussing the definitions of lakes, streams and rivers as contained in Black's Law Dictionary, Third Edition, the trial judge announced his conclusions as follows:

"According to these definitions we must, therefore, note that a lake does not imply a body of water in which a current flows, but it indicates a body of water, more or less, stagnant, in which the water is supplied from drainage. In rainy seasons drainage would increase, and hence, the level of the water would probably rise and a current would form. A river is distinguished from a lake in that it flows, more or less, in a permanent bed or channel between defined banks or walls with a current, whereas streams are bodies of flowing water including rivers. A stream, therefore, includes any body of flowing water.

"We have seen that the arm of Grand Lake is a body of flowing water and in my opinion constitutes, therefore, a stream within the meaning of Article 509 of our Civil Code.

"It cannot be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and it cannot be called a lake because its waters are not still or dead and the waters are not supplied from drainage as is required of lakes.

"I am fortified in this conclusion by the fact that the provisions of Article 509 of the Civil Code were intended to apply to such bodies of water, because accretions or alluvion can be created only by the deposits contained in flowing water. Under the theory therein contained a lake's water is immobile, and generally, cannot carry deposits to form additions to its shores. In the decisions of the Supreme Court, we find where the French law, from which our Code is derived, contains provisions specifically excepting lakes to the application of the rule contained in Article 509. It seems that the French Law and our Courts' interpretation of our law to the same effect, is substantial and reasonable in this respect. It is in keeping with the natural laws.

"On the other hand in all streams containing moving waters, which have the capacity of forming accretions, the lawmakers deemed it wise to pass these accretions to the owner of the property to which they became attached. It would indeed be arbitrary to give to the owners of land on a river the accretions to his land but to deny this right to landowners abutting a stream which is not technically or legally defined as a river, but which possesses all the characteristics of a river in the capacity of forming accretions. It, therefore, seems reasonable to me, as it must have to the law-writers, to include other streams in the category of rivers. It seems to me that this inclusion was made to cover such a case as we are here presented with. We are dealing with a stream

that possesses all of the characteristics of a river in its ability to remove and deposit dirt. No better evidence of this ability is needed than the fact that it has produced considerable accretions and particularly the accretion in question. Generally, a lake could not have so done because in it there is not sufficient moving water to move silt to the extent of forming additions to its banks.

"Therefore, I can put no other construction on the inclusion of 'other streams' under the cited Article, than the one herein given, for we might very well ask ourselves the question, what streams would the lawmakers have reference to? In my opinion there is but one answer to this question and it is: All streams whose water have the power to form accretions; and as the stream with which we are herein concerned has the power to form accretions, as it has done, it is then plain to me that it falls within the category of the streams mentioned in the cited article, and therefore, all accretions forming to its shores or banks belonging to the abutting property owners.

"Having thus concluded, I am, therefore, of the opinion that the accretions or alluvion formed to Lot 4 of Section 21, Township 11, S. Range 10 E. belongs to the owners of said land."

It will be noted, from an examination of the quoted portion of his opinion, the trial judge holds that the body of water known as the arm of Grand Lake can not be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and, on the other hand, that it can not be classified as a lake, because its waters are not still or dead and they are not supplied from drainage as is required of lakes. However, his holding is that the arm of Grand Lake is a body of flowing water, and therefore it constitutes a stream within the meaning of the term, "or other stream" referred to in Article 509 of the Civil Code. He reasons very logically that the "other stream" referred to in the article includes streams falling into the category of rivers. This inclusion covers the case here, because the stream involved possesses all the characteristics of a river in its ability to remove and deposit the soil.

■ The trial judge was correct in holding that the body of water known as the arm of Grand Lake is a stream with running water. It may be that he did not go far enough in holding that because it did not have well defined banks it was not a river, although, with this exception, it possesses all the characteristics of a river. In his holding, the trial judge overlooked the admission of the State, as contained in paragraph 6 of the agreed statement of facts, that the stream in question flowed between banks and its width between the banks at two separate and distinct points are given.

The arm of Grand Lake is not and has never been stagnant, but has always consisted of running water. It is unmistakably a part of Atchafalaya River by which its waters are solely supplied. It is not subject to the ebb and flow of the tide and through it the waters of the Atchafalaya River run to again form a distinct river at

the Town of Patterson before reaching the gulf.

The evidence in the record places Bayou Nimrod, Chicot Pass and the arm of Grand Lake in the same category. All are streams through which the silt bearing waters of the Atchafalaya River flow pass the land involved herein in its course to the Gulf of Mexico. The map makers, engineers and surveyors referred to in the record were consistent in the name given, "Arm of Grand Lake." None of them called it a lake.

Wide mouth streams are common in Louisiana where the land is low near their mouths, particularly in cases of this kind where several bayous join to form a common mouth. Even if it had not been expressly admitted that the arm of Grand Lake is a silt bearing stream, there is nothing in the record to indicate that it must be classed as a lake.

The map, marked Exhibit State No. 5, plainly shows that all the alluvion deposited between the arm of Grand Lake and Chicot Pass was brought down by those two bodies of waters together with the waters of Bayou Nimrod. The map shows that the bayou was formerly a wide stream which while depositing alluvion along its banks, extended its mouth into the waters of the arm of Grand Lake. It is not definitely shown what proportion of the alluvion was contributed by each stream, but it is evident that Bayou Nimrod has been the heaviest contributor in that respect.

The oil well involved in this suit is located on the north bank of Bayou Nimrod

as it has extended itself beyond the original meander line.

Counsel for the appellants assert that the land area in contest was built up by the diversion of the waters of the Atchafalaya River. They state that the Atchafalaya River flowed around Grand Lake and the area of the arm of Grand Lake. They argue that the statement is borne out by the map of Lafon, dated in 1806, which is in evidence, marked Exhibit State 7. The Lafon map, however, is at variance with all other state maps and, hence, it is evidently erroneous and was never made from any actual survey.

There is also in evidence State Exhibit No. 8, a map "from actual survey" by William Darby, endorsed "Entered according to Act of Congress the 8th day of April, 1816, by William Darby". This map and the Lafon map were made about the same time and no material changes in topography could have taken place.

The Darby map is one of the best known old maps of Louisiana and has been introduced in evidence in several law suits. A comparison with the more recent maps in evidence will prove that, considering the conditions under which Darby worked, his map is remarkably accurate.

This map shows the Atchafalaya flowing out of the Mississippi River a short distance below the mouth of Red River. This long bend in the river is what is known as Old River since the main river cut through this bend. The general route of the Atchafalaya River is shown very much as it is today except that from Butte La Rose to Six Mile Lake this continuous stream now

has several different names—Little Atchafalaya, Upper Grand River, Lower Grand River, Chopin Chute, Lake Natchez, Big Godell, Belle River, Little Godell and Bayou Long.

, Darby's map shows a large lake called Lake Chetimaches. Lake, Round, Lake Fausse Pointe, Lake Dauterive, Lake Chicot and Six Mile Lake are included in this lake. Several connections are shown between the Atchafalaya River and Lake Chetimaches, not as many as really exist but enough to show that at least since 1812 the Atchafalaya River has broken up at Butte La Rose to flow through many streams and the chain of Lakes to reunite in one stream at Berwick Bay. This amply demonstrates that since 1812 there has been no noticeable diversion of the waters of the Atchafalaya River to Bayou Nimrod, Chicot Pass, or Arm of Grand Lake.

The Atchafalaya River, being an outlet for both the Mississippi and Red Rivers, has always been a silt bearing stream. It has always been alluviating the Atchafalaya Basin. It is not shown when the Atchafalaya's orderly process of alluviating the Atchafalaya Basin was interrupted by the formation of the log jam near what is now Krotz Springs, but this was no doubt prior to 1812, as the "Great Raft" is shown on Darby's map. This log jam was removed in 1861 under supervision of the State of Louisiana.

While the log jam was in place the river overflowed its banks, spread over the upper basin, deposited its alluvion there, and cut new channels. Most of the water thus diverted returned to the river through

Bayou Alabama on the east and Bayou Courtableau on the west.

The construction of levees along the Red and Mississippi Rivers, which began on the Mississippi about 1717, produced progressively increasing flood heights as the levees were enlarged and extended. High flood levels increased the flow of water into the Atchafalaya. The breaking up of the log jam, permitting the return of the river to its old channel, resulted in less overflow into the upper basin, more flow, and consequently greater deposit of alluvion in the lower basin. The natural alluviation of the Atchafalaya Basin, interrupted by the formation of the log jam, was renewed after the removal of the raft and is now again proceeding in an orderly manner.

No work installed under the Federal Flood Control Act has resulted in adding any alluvion to Lot 4, Section 31, Township 11 South, Range 10 East. On the contrary, the channel dredged in Grand Lake increased the rate of flow pass the area in question to deposit the silt as islands in the lower end of Grand Lake.

It has already been observed by this Court in State ex rel. Atchafalaya Basin Levee District v. Capdeville, 146 La. 94, 97, 83 So. 421, that the Atchafalaya River divides itself in various rivers, bayous and streams, which, in turn, flow through a chain of lakes, and which again assumes its river identity before flowing into the Atchafalaya Bay and thence into the Gulf of Mexico.

■ Judicial cognizance must be taken of the fact that the Atchafalaya River is

one of the main outlets of the Mississippi River and is a stream of swift current and with a large discharge of waters.

From Butte La Rose, which is about the point where the Atchafalaya begins to break up in numerous streams, we find that one of these streams is the Little Atchafalaya, called Bayou Larrompe, which enters a stream appearing on the map as Lake Mongoulois, but which is really a wide stream and not a lake. This stream, in turn, forks into two other streams—one known as Bayou Chene and the other as Bayou Crook Chene. Bayou Crook Chene, flowing in a southwesterly direction, loses itself first in a stream called Crook Chene Cove, and then in a body of water called the arm of Grand Lake. This latter body of water is, in fact, a stream flowing between banks having all of the characteristics of a wide river, which appears to be only the widening of Bayou Crook Chene. This stream, called the arm of Grand Lake, then in turn connects with Grand Lake at a point where another stream known as Chicot Pass, connecting Chicot Lake with Grand Lake, empties into Grand Lake. The stream known as the arm of Grand Lake has a width between banks of 3,960 feet at its northern point and 4,400 feet at a point opposite Lot 4 of Section 31, Township 11 South, Range 10 East. This width is relatively insignificant as compared to the width of Grand Lake, and this width between banks negatives the idea that it is a lake instead of a widening branch or fork of the Atchafalaya River. Also emptying into the body of water known as the Arm of Grand Lake is a bayou known as Bayou Nimrod; which connects with Bayou Chene through a connection with another bayou known as Dead Man's Bayou, and Bayou Chene, with which Bayou Nimrod is thus connected, is clearly one of the forks of the Atchafalaya River, and Bayou Nimrod itself is also another fork of the Atchafalaya River.

In their brief, counsel for appellants refer to the case of State ex rel. Board of Commissioners v. Capdeville, 146 La. 94, 97, 83 So. 421. They say that this case throws considerable light on the factual situation involved in the area in which Grand Lake is situated, and that it "disposes rather decisively of any contention that Grand Lake is not truly a lake." We do not find that the cited case has any bearing on the issue presented in this case. The islands and sand bars involved in the Capdeville case had already been formed, and they definitely belonged to the State under the provisions of Article 512 of the Civil Code.

The cases of State v. Erwin, 173 La. 507, 138 So. 84, and Miami Corporation v. State, 186 La. 784, 173 So. 315, also are referred to in their brief by counsel for appellants as authority for the contentions urged by them, but neither of these cases is decisive of the question involved in this case. However, in some of its aspects the decision in the Miami case supports the contentions urged by the appellees. Thus, after referring to and quoting Articles 509, 510 and 453 of the Civil Code, the Court, at page 794 of 186 La. at page 318 of 173 So., in the opinion, observes as

follows: "The articles quoted in reality make the riparian owner a party to an aleatory contract, in which the State as the owner of the bed of the stream is the other party, and which contract provides that in the event one party loses by the encroachment of the stream and the other gains, the loss is offset by the possibility of a reversal of the conditions."

Counsel for appellants further cite the following cases in support of their contention: Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806; State v. Bozeman, 156 La. 635, 101 So. 4; McGlothlin v. Shreveport, 160 La. 101, 106 So. 708; and State v. Jefferson Island Salt Mining Company, 183 La. 304, 163 So. 145. Particular stress is laid on the Bozeman case and the Jefferson Island case. None of those cases is authority for the position taken by the appellants in this case.

In the Jefferson Island case, the defendants did not dispute the contention of the State that the land caused by the recession of the waters of Jefferson Lake from the meander line as originally established belonged to the State, but confined themselves to the proposition that Jefferson Lake had never been a navigable lake and that under the Spanish concession or grant to which they traced their title, defendants' lines extended to the middle of the lake. The Court recognized the State's title to the

land, because it found that Jefferson Lake was a navigable lake in 1812.

The Bozeman, McGlothlin, and Slattery cases are not cases where running waters retired slowly and imperceptibly, but are cases where bodies of water that were at one time navigable lakes were drained by the work of man.

The trial judge held that the arm of Grand Lake is a stream of flowing water and that Article 509 of the Civil Code applies to the alluvion on its banks. Regardless of the characterization of the water as a river or merely as a flowing stream, the conclusion reached by the trial judge is correct.

For the reasons assigned, both judgments, the one overruling the exceptions to the jurisdiction of the court and the other disposing of the case on its merits, are affirmed.

O'NIELL, C. J., concurs in the decree because it is based upon the finding that the so-called arm of Grand Lake was in fact a running stream, in the nature of a river, but he adheres to the dissenting opinion which he handed down in the case of Miami Corporation v. State, 186 La. 784, 173 So. 315.

ODOM, J., absent.