PONDER, Justice.
 

 ' The plaintiffs are appealing from an adverse judgment. After carefully reviewing the record in this case and. the briefs filed by the. parties to the suit, and after considering the arguments advanced by counsel, we have arrived at the conclusion that the written reasons handed down by the trial judge properly determine the issues raised in the cause. The trial judge has carefully stated all of the issues, clearly analyzed the testimony, and aptly applied the law relevant thereto. After ■ a careful consideration of the written reasons handed down by the trial court, we have decided to adopt them and make them the opinion of this Court, viz.;
 

 “The two plaintiff corporations, the Transcontinental Petroleum Corporation and the Mineral Domes Production Company, Inc., brought this action against the Texas Company and the St. Martin Land Company to have plaintiffs’ mineral lease from the State of Louisiana (State Lease No. 323) on the beds and water bottoms in Townships 8 and 9, South of the Louisiana meridian, recognized as bearing upon the bottom of a certain water-course located in Sec. 21, Township 8 S., Range 7 E. Plaintiffs claim their rights flow from the fact that this water-course was a navigable stream at the date of the admission of the State of Louisiana into the Union, and that the State has not disposed of its title thereto except by the mentioned mineral lease.
 

 “Plaintiffs further allege that the defendant, the Texas Company, has drilled two wells, St. Martin Land Company Wells No. 12 and 13, in the bed of this water-course, and has extracted oil therefrom, the value of which plaintiffs seek to recover. As an aid in arriving at the value or quantity of the oil extracted, they annexed interrogatories to their petition, and, upon order, the same were duly answered by the defendant, the Texas Company.
 

 “Both defendants deny that the watercourse in question is navigable now, or was
 
 *55
 
 navigable in the year 1812, in which year the State of Louisiana was admitted into the Union, and hence deny that the State ever enjoyed ownership resulting from this alleged fact. They also deny that either of the wells mentioned is in the watercourse.
 

 “The Texas Company then sets out that it acquired and owns the mineral rights, except a mineral royalty owned by the St. Martin Land Company, under all of said Section 21, and it asks that said right be recognized. As alternatives it claims that if either well, or both wells, be located in the "water-course, and if the water-course be found to belong to the State, then the wells are bottomed outside the said watercourse, and beyond the title of the State and under the land of the St. Martin Land Company;, that the Section 21 concerned herein was selected and approved under the Swamp Land Act of March 2, 1849, 9 Stat. 352, and subsequently transferred by the State to the Atchafalayia) Ba;sin Levee District and by said acts the State either divested itself of its ownership, or ha's estopped itself from now claiming title to any portion of it. If none of these contentions can be maintained, then the said company styles itself as a trespasser in good faith and claims all of the advantages that such position commands. It also calls into warranty its codefendant, the St. Martin Land Company.
 

 “The defense of the St. Martin Land Company raises practically the same issues, but it adds the additional defense, that the effect of the suit is to annul a patent issued by the State of Louisiana, and under Act 62 of 1912 such action is barred by the prescription of six years.
 

 “During the trial plaintiffs’ claim upon Well No. 13 was formally abandoned as it was admitted that the same is not within the water-course. 1
 

 “As plaintiffs’ entire case is based upon the navigability of the water-course in the year 1812, this point comes first for consideration. Should the conclusion thereon be with plaintiffs, the then defendants’ special defense that the well is not in the water-course is the next point to adjudicate. Should the conclusion on this .issue be again with plaintiffs, then we should go. into defendants’ alternative defenses. But,, should the adjudication be adverse to plaintiffs on the navigability of the watercourse, then the other issues become moot,, for, in this case plaintiffs would fail to. make title, and necessarily, their claim must fall. It would then be of no moment whether the well was in or out of the watercourse.
 

 “Passing, therefore, to the consideration of whether or not the water-course in controversy was navigable when the State was admitted into the Union on April 30, 1812, we must necessarily approach the question entirely through recorded evidence, deductions and analogies. The latter two methods are necessarily highly scientific and specialized, and I may add, somewhat inaccurate. The inaccuracy must be attributed to - the inability of man to uniformly conclude from observation of given facts, as well as from the lack of the powers possessed by bur senses to uniform
 
 *57
 
 ly appreciate existing facts. It is but natural, therefore, that we should find marked disagreement between the persons whose services were engaged herein in both phases where human frailty so often manifests itself. I mention this to emphasize the fact that the rejection of a theory advanced by one conversant with the subject should not be construed as a reflection upon that person’s ability. It is not the aim of this Court to do so, as I have gained many hours of fascinating enjoyment in perusing each of the theories advanced herein. I want it to be known that I have marvelled at the thoroughness and clarity of the theories submitted, and I appreciate the effort made, which was so successful in most cases, at developing highly scientific and technical subjects so simply as to be within the grasp of the layman’s mind.
 

 “However, from these theories, I had to come to a conclusion. My conclusion is incorporated in the following discussion.
 

 “The water-course in question is called Bayou Ledet by plaintiffs and Coulee Ledet by defendants. We shall call it Ledet. At present its course is only a slight depression on the surface of the earth which is visible to the eye at low water stage from the vicinity of the new levee near Henderson, in Section 19 of Township 8 South of Range 7 East, and easterly thru Sections 20 and 21 where it connects with the bays and lakes of the Atchafalaya basin system, into a bay called locally, Bay Patin. West of the levee the work of men has obliterated its natural channel so that it cannot be accurately traced, but enough evidence is left to permit us to surmise that at one time it connected with Bayou Teche, perhaps in Sections 60 or 61, just south of Cecelia. Since the construction of levees in recent years which confine, and perhaps increase the amount of water in the Atchafalaya Basin, Ledet is entirely under water the greater part of the time and its location and course cannot be followed by the eye. Therefore, no one contends that the watercourse is presently navigable.
 

 “However, from the amount of silt which has been deposited over the original or one time bottom of the water-course, neither plaintiffs nor defendants contend that it was not at one time a stream of sufficient caliber to support navigation, and hence, navigable. Plaintiffs place the amount of silt in the water-course at about six feet at or near the well and at about seven feet at its connection with Bay Patin, and defendants place their figures at slightly less, and, at other places, considerably less. In either case, however, it is safe to conclude as a fact that the stream was at one time capable of supporting navigation, perhaps connecting Bayou Teche with the Atchafalaya Basin.
 

 “The only difference between the parties, therefore, is whether the stream filled in before or after the year 1812. The plaintiffs contend that it filled since 1812, that is, it began to fill in the 1860’s when a raft was removed from the Atchafalaya River. The defendants contend that it filled long before 1812. Both contentions are supported by well-considered theories. Our only task now is to formulate our conclusion from these theories.
 

 
 *59
 
 “It is plaintiffs’ theory as expressed by Dr. Richard J. Russell that the low elevation of the Atchafalaya Basin is the result of the lack of sedimentation or alluviation in the territory which is entirely bounded by higher ridges forming the banks of streams, most of which streams still occupy their positions. The formation of the basin, he says, is of rather recent geological date, say, about one thousand years, ago. The date is derived principally through the study of Indian culture therein. (T. pages 748.) Within historical times, he points to three factors greatly affecting sedimentation within the basin; these are: (1) The removal of the great raft in the Atchafalaya River between the years 1840 and 1861; (2) the construction of a railroad bed through the central part of the basin about the year 1906; and (3) the construction of artificial levees in the basin, starting about ten years ago. (T. page 9.)
 

 “The result of the removal of the great raft, Dr. Russell says, was not only the acceleration of sedimentation but also the change in the character of these deposits. Before the removal, sedimentation was slow and its organic content was low. After its removal, sedimentation increased greatly, and the water picked large amounts of vegetable matter which it deposited lower down the basin sufficient to change the characteristics of the deposits from clay to muck. (T. 10, 11, 12 and 338.)
 

 “The building of the railroad, Dr. Russell says, restricted the passage of the water from north to south through the trestles •and gaps left in the railroad’s foundation, which caused more sedimentation on the north than on the south side of the railroad. (T. 12 and 13.)
 

 “The construction of the floodway levees, Dr. Russell says, will be the most upsetting condition of all. Water-levels have been drastically changed which eventually will be accompanied by a corresponding change in hydrological patterns. (T. 13.)
 

 “On the other hand, the defendants theorize Ledet ceased to be navigable, either by recession of the water or by silting, long before the year 1812. The theory is founded upon several facts or deductions. One of the main facts advanced to substantiate the theory is that large trees whose germination and growth can be traced back into the centuries have grown in the bed of Ledet; most of these trees being cypresses which cannot germinate and begin growth under water.
 

 “Defendants’ witness, Dr. E. H. Sellards, reasons that the alternating layers of silt and clay found to exist outside Ledet in the neighborhood of the oil well in, Sec. 21, at one time in the distant past extended throughout the area; in Ledet as well as outside. In other words, if we go far enough back there was no Ledet. Then certain conditions came into existence which caused water to flow over the area and .this flow had sufficient speed to scour the top layer of silt, the clay layer underlying it and the second silt lying beneath this clay and between it and the bottom clay which formed the bed of the stream.
 

 “The witness does not seem to have indicated what he thought this condition was. But he goes on to explain the subsequent
 
 *61
 
 silting of Ledet in this manner; that the bed of the Atchafalaya River, or some other large stream, was probably through the Opelousas Bay system, of which Bay Patin is a part, and that sediment was brought into Ledet through this system. The system is much nearer Ledet than the present Atchafalaya; as a matter of fact, Ledet is or was connected with the system through Bay Patin. This deduction is based not only on the physical features of Bay Patin and the system as a whole, where nine feet of silt has been found, but also upon the fact that under the present conditions no silt-bearing water is introduced into the area of the well even when the Atchafalaya River is at high stage. He points out that any water coming into the area from the north could not approach Ledet in the bed of a stream, but would necessarily have to travel overland, and, however, sediment-ladened it may be, the thick growth of vegetation encountered en route would cause precipitation of the load long before it entered the area. The water presently entering the area evidently comes by way of Opelousas Bay and Bay Patin which is generally, or commonly, referred to as from the south, or east. A sample of the water was introduced in evidence to show that it is sediment-free.
 

 “Dr. Sellards then points out that as the silt was brought into the area before the Atchafalaya' River occupied its present bed, the date of entry must necessarily have been before 1812. He bases this finding upon the fact that according to the report of the U. S. Engineers in 1880 the Atchafalaya River, when the raft began to form, was considerably wider at that side than when the raft was removed; indicating a river of considerable age when the raft began to form. The Engineers’ report indicates that some 10 -or 15 feet of silt had • accumulated over the raft and that this silt was supporting the growth of trees equal in size to those on and adjacent to the banks. The additional evidence was also contained in the report that deterioration had set in in the trees forming the raft to such an extent that they became flattened and their identity became lost. He estimates that certainly the interval of a century must' have been required to produce such a condition.
 

 “From these facts and supposition, Dr. Sellards therefore deduces that, counting back from 1880, the century required for the formation of the raft would place its beginning at about 1780, and, as the Atchafalaya River was already a large stream, it must have occupied its bed many years previously (the number of which he does not estimate). Then the silting, or filling up of Ledet, having occurred prior to acquisition of its present bed by the Atchafalaya River, certainly long before 1812, even long before 1780, Ledet had ceased to be a functioning stream on account of the deposits in its bed, and hence not navigable.
 

 “As reinforcement for his deduction, Dr. Sellards also points out that when the Ludlow survey was made, in the years immediately prior to or after the year 1812, the high water mark on trees near the section line between Sections 20 and. 21 was four feet'; that this.much water at that
 
 *63
 
 point would necessarily have covered all of section 20 west of that point and in the vicinity of where Ledet lies. But that from his examination no top-silt lies in the western portion of Sec. 20. It is evident, therefore, that the water at that time was not silt-bearing, and hence the deposition of silt which choked Ledet must have been deposited before, which, of course, was prior to 1812. Dr. Sellards uses the Ludlow filed notes to further deduct that, the width of the water in Ledet about 1812 being nine inches (T. 370), its depth was only one foot or less. And, a depth of one foot, or less, at that place, would not furnish sufficient water to make Ledet a navigable stream at the well.
 

 “He advances additional data that the bed of Bay Patin is approximately three feet lower in elevation above sea-level than the bed of Ledet in the vicinity of the well, and a cypress tree grew in the bed of Lake Patin, the origin of which tree can be placed at about 70 years ago, and, as this type of tree does not germinate in water, it is a scientifically established fact that there was no water in Bay Patin 70 years ago, and certainly if Bay Patin had no water, there could have been no water in Ledet at the well site for it had a higher elevation. (See T. pages 176, 367, 370 and 372 et seq.).
 

 “Then finally, Dr. Sellards presumably in opposing Dr. Russell’s theory that depositions were rapid, highly organic and made since 1860, and in substantiation of his theory that the depositions were' made slowly, over a long period of years, and so long ago' as to lose much of their organic content, asserted that according to his tests the organic content of the soil in Ledet and its vicinity is deposited by the Colorado River, near Austin, Texas.
 

 “By way of rebutting plaintiffs’ theory regarding the manner, and hence the time, of the silting of Ledet (which they place after the removal of the Atchafalaya raft in the 1880’s), the defendants presented their witness, Mr. D. D. Utterback, also a geologist. From a study of the contours and elevations of the area west of the Atchafalaya and north of the well, or Ledet, as well as a report made by the U. S. Engineers, he comes to the conclusion that water from the Atchafalaya River could overflow over the higher ridges only when the water would reach 25 feet above sea-level, which is about four feet above flood stage, and then this water could escape only through the Opelousas Bay system. However, if Bayou Courtableau were opened, the water flowing into it, would also find its- way to, Ledet by the same route. This Bayou was closed when Mr. Utterback made his investigation and hence he had no opportunity of observing its functions. And, by coming through the Opelousas Bay system, the channels widen out to the extent and distance from Ledet as to cause the water to deposit its load before reaching Ledet. On a trip that he took through this- territory, this was his observation. (T. 235 and 239.)
 

 “Plaintiffs, however, challenge this conclusion through its witness, Dr. Russell. Dr. Russell points out (T. 468 et seq.) that waters from the Atchafalaya River would certainly have entered Bayou Courtableau,
 
 *65
 
 and from this bayou the water would have flowed into such bayous as Bayou Fordcche and Little Fordoche, and then into the Opelousas Bay District as the elevation over that territory would have directed it that way.
 

 “Dr. Russell further challenges Dr. Sellards’ theory that Opelousas Bay and Bay Patin were at one time occupied by the Atchafalaya or other large river. He bases this conclusion upon the absence in these bays of the characteristics of the Atchafalaya, or other large stream, such as the absence of natural levees. (T. 475.) He reiterates his opinion that these bays are the result of alluviation of a large lake. Dr. Russell further traces the organic, or silt, deposits in and around Ledet to the Atchafalaya as well as to local decayed vegetation, and the clay in the channel to streams from the Teche Levees to the west, but mostly from streams to the north and ihe Atchafalaya.
 

 “Both plaintiffs and defendants have offered lay evidence as to the navigability and nonnavigability of Ledet during recent years. Each of these witnesses testified from his observation.
 

 “As concisely as I am able to state them, these are the facts submitted upon which we are to decide whether or not Ledet was navigable in the year 1812.
 

 “There is no dispute upon the law aplicable. If Ledet is found to have been lavigable in 1812, then its bed belongs to he State of Louisiana, unless it has divest-id itself of it, or is estopped to claim it now. If Ledet was not navigable in 1812, then the State of Louisiana has no title to its bed.
 

 “It seems agreed that the title to the beds of navigable streams and lakes in Louisiana was acquired by the State of Louisiana upon its admission into the Union by virtue of its sovereignty, as was held in State v. Capdeville, 146 La. 94, 83 So. 421; State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145; State v. Bayou Johnson Oyster Co., Ltd., 130 La. 604, 58 So. 405; Smith v. Dixie Oil Co., 156 La. 691, 101 So. 24.
 

 “It seems also agreed that a body of water is considered navigable when, by its depth, width and location is rendered available for commerce, whether it is actually so used or not. State v. Capdeville, 146 La. 94, 83 So. 421.
 

 “All in all, it is a very difficult, next to an impossible task, and, I may add, unnecessary to have to accept, as a whole, the theories, deductions and analogies of either plaintiffs or defendants. To have to do so would compel us to accept and give the sanctity of judicial decree to a theory which is at best inaccurate and only a supposition, and, I may say, not far removed from a guess. Whenever it is at all possible, I believe courts should refrain from giving to any state of facts the sanctity of judicial decree unless such facts are so strong, positive and convincing as to preponderantly establish the contention as a fact. In this case I find myself unprepared to accept, without qualification, either of the conditions advanced.
 

 
 *67
 
 “However, there is one thing that is clear and which must be generally accepted. It is, that plaintiffs have assumed a heavy burden 'in assuming the task of proving, by a preponderance of the evidence,. that Ledet was navigable on a certain and definite date, when, at the present time and during the past few years, it is and has been only a slight depression on the earth’s surface, which could hardly compare favorably with an efficient small ditch. In law plaintiffs are only required to establish their case by a preponderance of the evidence. But at the outset they are at once faced with a condition which they must overcome. Not only must they show that Ledet was navigable, but that it was navigable on a certain date.
 

 “The task is not impossible, but to prevail plaintiffs must have a stronger case than defendants’; their proof must be more convincing.
 

 “Although I am not prepared to say that the defendants have established the fact that Ledet was not navigable on April 30, 1812, likewise, I am unprepared to say that plaintiffs have established the fact that it was. The plaintiffs have therefore failed to discharge their legal burden of proving their case by a preponderance of the evidence, and hence cannot succeed in their claim.
 

 “I shall point out briefly upon what this conclusion is based.
 

 “For plaintiffs to succeed, the Court must be convinced by a preponderance of the evidence, after considering the case as made up by all of the evidence introduced, that Ledet silted up as plaintiffs theorize and during the period they set. They theorize that it silted from the soil lying over the raft, the soil brought by the Atchafalaya, and decayed vegetation of the vicinity brought into Ledet by the increased current after the removal of the raft. They set the period at after 1860. Between 1860 and 1942 only eighty-two years intervened. If no appreciable silting occurred in Ledet before 1860, likewise no silting should have occurred in the Atchafalaya Basin as a whole. And, if the Basin was a lake, as plaintiffs theorize, it was a very short time indeed for such a sweeping change to have taken place. The quadrangle maps introduced in evidence (pp. 14, 15, 16 and 17) show an average elevation of about 10 feet in the Basin and the quadrangles of 1934 and 1935 show a vast quantity of exposed land as compared with the land under water. There is nothing in the evidence which justifies the conclusion that the Basin filled so rapidly. On the contrary, Ludlow’s field notes indicate that a great number of trees existed in the Basin, and in the vicinity of Ledet in about the year 1812, and that the Basin as a whole was free of water, for he mentions watercourses which he could not have seen if their banks were covered by water. This was forty-eight years before the removal of the raft, if we accept the removal date of I860 as fixed by plaintiffs.
 

 “The next hypothesis which seems questionable is that the silt in Ledet was borne by water which had entered the Courtableau from the Atchafalaya and overflowed or left the Courtableau through Fordoche, Lit-
 
 *69
 
 tie Fordoche and Mamselle Bayous. Let us consider this theory at both low water and high water stages. At low stage the water should have been confined within the banks of these streams, and they flow into Lake Fordoche, then into Portage and into Opelousas Bay which has a direct connection with the larger bodies of water farther south. To come into Ledet this water would have had to 'back up’, as it were, as Ledet is not in the line of flow, but is in the other direction. It forms no part of the flow of. these systems and the surface elevation increases as Ledet is followed in the direction away from Opelousas Bay. (See the quadrangles pp. 14, 15, 16 and 17.) It is very difficult indeed to suppose that up to six feet of silt could have been deposited in Ledet some one-half mile up stream from its connection with Bay Patin in some eighty years. There is no evidence that such a rate of deposit has existed in other streams in the territory. There are numerous other streams below Ledet, and situated in much more favorable positions for silting than Ledet, which do not seem to have silted nearly as much as Ledet. (See p. 16.) I am referring particularly to the streams of the Opelousas Bay system, and those lying between it and the Atchafalaya.
 

 “Then if we consider the condition at high water stage we see where the water level would have to go up between 20 and 25 feet before it could flow out of the Atchafalaya over its right or west bank to come overland into the vicinity of Ledet. It is not to be presumed that such water level existed all the time, or even for a greater part of the time, but when it did occur it had to flow several miles overland before it reached the vicinity of Ledet, and, considering the great amount of vegetation existing in the territory over which it flowed, it becomes very difficult to presume that sufficient silt could have survived the route through this vegetation to fill Ledet in such a short time, say, eighty-two years. Then again, this silt would have been deposited somewhat uniformly in the entire area of Ledet, and the evidence is uncontradicted that there is no silt in the western portion of Section 20. It should have silted there as well as in Section 21, where the well is, because the difference in elevation between the two areas is not great.
 

 “This latter fact, the lack of silt in the western portion of Section 20, also casts another doubt on plaintiffs’ theory of silting.
 

 “According to Ludlow’s field notes, the water mark on the trees between Sections 20 and 21 was four feet. This being true, the western portion, as well as the entirety, of Section 20 should have been inundated. If this high water were silt containing, it should have deposited its contents in the western part of Section 20. This same high water is now silt-carrying, this is an uncontradicted fact, and if it was non-silt-carrying about 1812, we cannot assume that it carried silt during the intervening period. There is no other evidence than plaintiffs’ theory that it did. Were we without another theory than plaintiffs’ more weight would perhaps have to be given it. But we have another, advanced with equal credibility, regarding the silting of Ledet,
 
 *71
 
 which is not based upon the silt-carrying characteristics of the over-flow water, in fact, it is based upon its non-silt-carrying characteristics, so plaintiffs’ theory loses much of its force.
 

 “Another issue in the case that weakens plaintiffs’ position, is the location of trees showing great age either in or within the natural levees of Ledet. Many of these trees show great age, one having its origin about two hundred seventy years ago. The defendants place most of these trees in Ledet, some in its very middle. The plaintiffs claim they are not in Ledet.
 

 “On the plat D-147, defendants have placed four trees within Ledet. Two of these are cut trees numbers five and six, both are cypress. The age of number five has been placed at two hundred seventy years by Dr. H. C. Tharp, a botany professor and ecologist (T. 254), and the age of number six at between one hundred fifty to one hundred fifty five years (T. 265), and perhaps between four hundred and five hundred years (T. 271).
 

 “Dr. Tharp testified that he visited the site of the trees and the water level was low enough to permit him to see the natural levees of Ledet, and that both of these stumps were well within Ledet and near its center.
 

 “The photograph D-156 shows tree number five, and from it we can see that the stump is well within the stream. Behind it is a very large stump. This stump would indicate great age, if number five is two hundred seventy years old.
 

 “Then again, in D-155 a large cypress tree is shown, and certainly from the photograph it is well in Ledet and perhaps very near its middle. Another tree is shown in D-153. In D-152, three large trees are shown which apparently occupy practically the entire bed across Ledet.
 

 “To support their contention that these and other trees were not located within Ledet, plaintiffs have made and filed in evidence the plat P-29. An examination of this plat shows that the width of Ledet, as platted thereon, is far from being uniform and seems to decrease in width particularly where the trees are close together from one side of the water-course to the other.
 

 “Plaintiffs said that this plat (P-29) was traced from their findings by visual observations and by walking the banks of Ledet. They criticize defendants’ method in tracing Ledet by the additional means of bore holes. They, Dr. Russell and counsel, liken the procedure to that of locating a road. They classify the methods as awkward. They contend that a better method is by visual observations. We agree that this must be true in the case of locating a road, unless the road is covered by water.' And here, we are dealing with a water-course that is covered by water a great part of the time. I believe that it must be conceded that the most objectionable point of this system is the amount of labor and time it requires. As far as its accuracy is concerned, I believe we must concede that it cannot be questioned. It can locate the bed and
 
 *73
 
 banks of a stream, just as accurately as it could the shoulders, ditches and bed of a highway.
 

 “But all in all, we cannot escape the conclusion that there are cypress trees inside the levees, or banks, of Ledet showing an age of more than one hundred thirty one years. This shows that in 1812 these trees were already there, and cypress trees being incapable of germinating and starting growth under sustained periods of water cover, we must accordingly conclude that before 1812, there were no sustained periods of water cover where they germinated. Even if it be admitted that these cypresses are not in mid-stream, yet we must conclude that there could not have been sufficient water in mid-stream to support navigation, for if that portion of the stream bed where they grew was exposed for lack of water, the size of the water course and the gradient of its bed is such that this conclusion is inevitable. The bed of Ledet, when it was a functioning stream, was approximately six feet below its natural levees in the vicinity of the well. And, without any silting, if one of these trees grew, say halfway between one bank and mid-stream, there could not be more than three feet of water at midstream. The width of the water would also have prohibited navigation.
 

 “No issue seems to have been made of Dr. Tharp’s testimony relative to his experiment with cypress seedlings. The seeds, he testified (T. 281), are deposited by riplets at the water’s edge, and there germinate. He also said that cypress seedlings of three or four years’ growth, died after submersion by water for about fifteen days.
 

 “Therefore, even if defendants’ location of and theory concerning the cypress trees be not accepted as a whole, and I can see no reason why it should not be, yet we are bound to conclude that the location of these trees inside the natural levees of Ledet, long before the year 1812, casts at least a serious doubt regarding the correctness of plaintiffs’ theory as to the silting of Ledet. This is especially true because this point, as much as it is inconsistent with plaintiffs’ theory, is as equally consistent with defendants’ theory and goes to a great degree in strengthening it. This line of evidence cannot easily be disregarded, as it is more visual, more concrete and more definite than one which leaves little, or no, physical evidence. The possible range of error is not nearly as great in determining the age and location of a tree, as in determining the amount, flow and silt-carrying characteristics of water generations back.
 

 “Some mention must be made of the • testimony of lay witnesses regarding their observations of Ledet within their life span. The view I have taken of this testimony makes it unnecessary to comment on the testimony of defendants’ witnesses, other than to note that they are much older in years and their memories naturally cover a much larger span of years, and surely, merit more weight.
 

 “Plaintiffs’ witnesses are forty three and forty eight years of age, respectively. The substance of their testimony is that they well remember that a boat, having a draft
 
 *75
 
 of about five feet, navigated Ledet .at all seasons for commercial purposes. The main impediment to the acceptance of this testimony is the well-established fact that the depth of Ledet, at its prime, in the vicinity of the well was six feet. Farther west, to the point where they say navigation existed, the depth should certainly have been less. But, even accepting the depth of six feet throughout its course, there must not have been any silting at all for it to support a boat of five feet draft. Their memories could not have run much further back than say when they were ten to twelve years old. That would put the date, at the furthest, when Amilcar Huval, the older witness, was ten years old, thirty-eight years back, or to 1904. If there was no silting in Ledet in 1904, then we must assume that silting did not begin as Dr. Russell says it did, with the removal of the raft. But from Huval’s testimony the boat navigated Ledet until it burned about twelve years ago. (T-78.) In that case, we must presume that Ledet filled in six feet of muck, as Dr. Russell puts it, or six feet of silt, as Dr. Sellards puts it, in about twelve years. It is needless to say that neither of these suppositions can be accepted. There is no evidence in the record to justify the conclusion that a geological status could have been continued through the centuries, and then in the last decade such a radical change occurred as to disturb that condition and deposit sediment in Ledet at the rate of one foot or two feet per year. It seems that nothing short of the intervention and considerable work of man could have produced this re-suit. And, of course, there is no such evidence in the record.
 

 “Therefore, as heretofore stated, I must come to the inevitable conclusion that plaintiffs have failed to discharge the legal burden imposed upon them of proving their case by a preponderance of the evidence, and accordingly, their suit must be dismissed.
 

 “Having reached this conclusion, it becomes unnecessary to consider any of the other issues of the case. Nor is it necessary to give to the defendants’ evidence lengthy discussion, or any other than the limited discussion given it above.”
 

 For the reasons assigned, the judgment is affirmed at plaintiffs-appellants’ cost.
 

 O’NIELL, C. J., takes no part.